**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY and VALIC FINANCIAL ADVISORS, INC., | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | )     **Case No.: 3:21-cv-00223-MHL** |
| | ) |
| CHARLES CORETH, MICHAEL RAWLS, and THOMAS ROBERTSON, | ) ) ) |
| **Defendants.** | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

Defendants, Charles Coreth ("Coreth"), Michael Rawls ("Rawls"), and Thomas Robertson ("Robertson") (collectively, the "Richmond Advisors"), by counsel, for their opposition to the Motion and Application for Temporary Restraining Order (the "Motion") (Docket No. 5) and Memorandum in Support of Motion for Temporary Restraining Order (the "Memorandum") (Docket No. 6) filed by Plaintiffs, The Variable Life Insurance Company ("VALIC") and VALIC Financial Advisors, Inc. ("VFA") (together, the "VALIC Companies"), state the following:

## JURISDICTION

In both their Complaint and Memorandum, Plaintiffs assert that "[t]he merits as to VFA's claims against all Defendants must be resolved in arbitration pursuant to the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Produce for Industry Disputes" and "the claims brought by VALIC against Coreth and Rawls must be resolved in AAA arbitration pursuant to the American International Group Inc.'s Employment Dispute Resolution Program ("EDRP")." (Compl. [ECF No. 1] at 1 n. 1); (Mem. [ECF No. 6] at 3 n. 1.) Each Financial

Professional Agreement ("FP Agreement") also makes explicit reference to the terms of the EDRP.  (*See* T. Robertson FPA (ECF No. 1-1) at 10; (C. Coreth FPA (ECF No. 1-2) at 10; (M. Rawls FPA (ECF No. 1-3) at 10.)  The VALIC Companies do not, however, attach the EDRP to any of their pleadings.  Therefore, the Court and the Richmond Advisors are left to guess as to what the EDRP says and how its terms might apply to the present situation.  However, when produced in other cases in which corporate entities related to the VALIC Companies have sought to enforce the provisions of the EDRP, the attached EDRP has stated that "[t]he Parties <u>must have mediated </u>their Dispute prior to filing an application for arbitration."  *See* Ex. B to Mem. in Supp. of Mot. to Stay Case to Compel Arbitration, and for an Award of Fees, (ECF No. 10-1) at 18), *Fiola v. VALIC Financial Advisors, Inc. et al.*, 2:19-cv-02777-HLT-JPO (D. Kan. 2020); Ex. 1H to Mot. to Compel Arbitration and to Dismiss or Stay all Proceedings, (ECF No. 13-9) at 6, *Garcia-Clara v. AIG Insurance Company- Puerto Rico et al.*, 3:15-cv-01784-CCC (D.P.R. 2015).  Accordingly, it appears that the VALIC Companies acted prematurely in filing this lawsuit and that this matter is not properly before the Court.

## <u>INTRODUCTION</u>

The Richmond Advisors resigned from VFA on February 5, 2021, to join CG Advisory Services ("CG").  Now, more than two months later, the VALIC Companies seek a temporary restraining order against the Richmond Advisors barring them from contacting the clients they served, in some cases for decades, and requiring them to "return" unidentified documents that the Richmond Advisors did not remove and do not possess.  Incredibly, the VALIC Companies also seek to prevent clients from transferring their accounts to the Richmond Advisors' new firm.  As discussed more fully below, not only would this be against the express directives of clients, it is

specifically prohibited by FINRA.  For all of the reasons discussed below, the VALIC Companies' request for a temporary restraining order against the Richmond Advisors should be denied.

Because the VALIC Companies cannot show past wrongdoing or evidence of wrongdoing intended in the future, they cannot demonstrate an imminent threat of harm.  Indeed, the complained of client contact has presumably already occurred and is not imminent or pending.  As to all of the complained of conduct, the VALIC Companies are precluded from showing an imminent threat as the alleged wrongful acts have all occurred historically, as far back as *two months ago*.  Furthermore, the purported harm to the VALIC Companies is not irreparable.  Indeed, the VALIC Companies have already proceeded for over two months without an injunction, and the VALIC Companies' purported injury, the loss of clients, can be easily calculated and compensated through monetary damages.

Ultimately, the VALIC Companies are far better situated to withstand the denial of the requested injunction, evidenced in part by the fact that they waited more than two months to request injunctive relief from this Court.  By contrast, enjoining the Richmond Advisors from continuing to service their clients will prevent the Richmond Advisors from engaging in a legitimate commercial activity and severely undercut their ability to earn a living.  Given the exceptional amount of time that the VALIC Companies allowed to pass before acting, the lack of any wrongdoing by the Richmond Advisors, the fact that the alleged wrongdoing has already occurred, and the availability of monetary damages, the Richmond Advisors stand to suffer considerably greater harm if an injunction issues than the VALIC Companies will suffer if one does not.

Although this Court need not look past the VALIC Companies' unsupported allegations of an imminent threat of irreparable harm, the non-solicitation covenants underlying VALIC's claims

are unenforceable against the Richmond Advisors.  Specifically, the covenant's defined terms "Protected Customer" and "Territory" are ambiguous and overbroad, and Texas law will not permit a former employer to prohibit a departing advisor from soliciting his preexisting book of business.

Finally, but equally important, the VALIC Companies' request for injunctive relief raises significant public interest concerns and is in direct contravention of FINRA Rule 2140 (formerly IM 2110-7), which expressly prohibits the VALIC Companies from requesting relief that would inhibit a client from moving his or her account.  *See* Exhibit A, FINRA Rule 2140.  Courts have been especially cognizant of the public interest in injunction cases involving departing financial advisors because of the nature of the relationship between financial advisors and their clients, which at least one court in this district has likened to an attorney-client relationship.  Given this unique and important relationship between a financial advisor and his clients, courts have repeatedly noted that the public interest is not served by enjoining a financial advisor from soliciting or continuing to service his clients, which is precisely what the VALIC Companies ask this Court to do.  Prohibiting such activity would have the direct effect of enjoining the Richmond Advisors' clients from maintaining a relationship with the financial advisor of his or her choosing and punishing customers for choosing someone other than the VALIC Companies to service their accounts.  Such a prohibition is not in the public's interest and is expressly prohibited by FINRA.

The VALIC Companies are unable to satisfy any of the factors necessary to justify the extraordinary relief of a temporary restraining order.  Therefore, the VALIC Companies' Motion should be denied, and the parties should be allowed to proceed to arbitration, as they contractually agreed to do.

## FACTUAL BACKGROUND[1]

The Richmond Advisors are currently employed by CG as financial advisors in its Richmond, Virginia office. *See* Exhibit A, Declaration of Thomas Robertson (hereinafter, "Robertson Dec.") at 1; Exhibit B, Declaration of Charles Coreth (hereinafter, "Coreth Dec.") at 1; and Exhibit C, Declaration of Michael Rawls (hereinafter, "Rawls Dec.") at 1). Prior to joining CG, Robertson, Coreth, and Rawls were employed by VFA as financial advisors, working in VFA's Richmond, Virginia office. Robertson Dec. at 2; Coreth Dec. at 2; Rawls Dec. at 2. The Richmond Advisors did not have "assigned territories" and served clients in multiple states. Robertson Dec. at 20; Coreth Dec. at 19; Rawls Dec. at 20. As Financial Planning Advisors, Mr. Robertson and Mr. Coreth did not service 403(b) groups and the vast majority of their clients are retired individuals, while Mr. Rawls could service groups and individuals. Robertson Dec. at 3; Coreth Dec. at 3; Rawls Dec. at 3.

The Richmond Advisors began working at VFA at various times, but over the last seven years were encouraged by the VALIC Companies to work as a "team." Robertson Dec. at 6; Coreth Dec. at 6; Rawls Dec. at 6. Unfortunately, the VALIC Companies refused to allow them to implement succession planning. *Id.* This position of the VALIC Companies and the pressure placed on the Richmond Advisors to push clients into VALIC annuity products, ultimately caused the Richmond Advisors to determine that it was in the best interest of their clients and their "team" to transition to a firm that would allow them to fulfill their fiduciary duties to their clients. *Id.*

On February 5, 2021, the Richmond Advisors resigned from their employment with VFA. Robertson Dec. at 7; Coreth Dec. at 7; Rawls Dec. at 7. The Richmond Advisors followed the standard procedure for resignations, delivering a written letter of resignation, returning their VFA

---

[1] The Richmond Advisors incorporate the Coreth, Robertson and Rawls Declarations by reference, as if set forth fully herein.

and VALIC property, and collecting their personal items.  Robertson Dec. at 7, 21; Coreth Dec. at 7, 20; Rawls Dec. at 7, 22.  Having had longstanding relationships with many of their clients, some of whom were friends and family, the Richmond Advisors felt obligated to inform their clients of this material change to their account relationship.  Robertson Dec. at 9; Coreth Dec. at 9; Rawls Dec. 9.  Prior to their departure from VFA, the Richmond Advisors jotted down the names, addresses, telephone number and/or email addresses and, in some instances, approximate account values, of the clients who the Richmond Advisors believed would want be contacted and made aware of their departure. Robertson Dec. at 8; Coreth Dec. at 8; Rawls Dec. at 8.  VFA never informed the Richmond Advisors that it would notify their clients of how to reach them and, indeed, the VFA representatives assigned to their accounts did not.  Robertson Dec. at 9, 11; Coreth Dec. at 9, 11; Rawls Dec. at 9, 11.

Some of the clients that the Richmond Advisors formerly served have sought to transfer their accounts to CG.  Robertson Dec. at 13 – 15; Coreth Dec. at 13 – 15; Rawls Dec. at 13 – 15.  Given the confusing and inaccurate description of the account transfer process provided by the VALIC Companies, it is critical to note that there are two primary types of transfers applicable to the VALIC Companies.  In order for a client to transfer Managed Investment Portfolios ("MIP") and non-managed brokerage accounts, the client must complete an Automated Customer Account Transfer Form ("ACAT Form").  Each ACAT Form must be signed by the client and requires the client to provide the required personal information.  Robertson Dec. at 13; Coreth Dec. at 13; Rawls Dec. at 13.  Completed ACAT forms are then submitted to the entity where the account is currently located, in this case VFA.  *Id.*

In contrast to the above process, because the VALIC Companies do not permit annuity contracts to be assigned outside of VALIC or VFA, a VALIC Annuity Rollover Transfer Out Form

("Transfer Out Form") must be obtained from VALIC or VFA. Robertson Dec. at 14; Coreth Dec. at 14; Rawls Dec. at 14. The client must personally call VALIC's and/or VFA's customer care department and request, receive, and complete the Transfer Out Form, which has a unique bar code. *Id.* VALIC or VFA then will close and liquidate the annuity and transfer the funds to the entity specified by the client. Robertson Dec. at 15; Coreth Dec. at 15; Rawls Dec. at 15.

The Richmond Advisors did not take or retain any Transfer Out Forms, and instead took steps to ensure that they did not possess client or VALIC/VFA information prior to submitting their resignations. Robertson Dec. at 18; Coreth Dec. at 18; Rawls Dec. at 18. To this end, at the time of their resignations, they returned the laptop computers, iPhones, and all other items that VFA/VALIC provided to them. *Id.* On a regular basis, the Richmond Advisors reviewed client information to fulfill their job duties and responsibilities while at VALIC and VFA. Robertson Dec. at 25; Coreth Dec. at 24; Rawls Dec. at 26. While the Richmond Advisors exported such information to VFA issued laptops in performing there job duties, they did not print or export any client information onto any devise, server, USB driver, CD, or other digital storage devise not owned by VFA or VALIC. *Id.*

## ARGUMENTS AND AUTHORITIES

## I.      VALIC Bears the Burden of Demonstrating That It Is Entitled to the Extraordinary Remedy of a Temporary Restraining Order.

The relief that the VALIC Companies seek against the Richmond Advisors is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The Court's discretion in determining whether to issue a temporary restraining order ("TRO") is guided by the *Winter* standard, which requires that the plaintiff show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in [plaintiff's] favor, and [4] that an injunction is in the public interest." *Id.* at 21.

Regarding success on the merits, a plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017)* (citation and internal quotation marks omitted).  Regarding the likelihood of irreparable harm, a mere possibility of harm is insufficient: "'Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a "clear showing" that the plaintiff is entitled to relief.'" *Id.* (quoting *Winter,* 555 U.S. at 22). Nor is harm "irreparable" if it is subject to compensation: "'[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.'" *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)).

The VALIC Companies are tasked with the burden of establishing that each of the four factors warrants the exercise of the extraordinary power of injunction. *Reid v. Johnson*, 333 F. Supp. 2d 543, 549 (E.D. Va. 2004) (citation omitted).

II.     **The VALIC Companies Fail To Satisfy Their Burden.**

      A.     **The VALIC Companies have not and cannot make a "clear showing" that an imminent threat of irreparable harm exists.**

To carry its burden, the VALIC Companies must make a "clear showing that [they] will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citation omitted). "Additionally, the harm must be

irreparable, meaning that it cannot be fully rectified" by the final judgment. *Id.* (internal quotation marks and citation omitted).  The VALIC Companies are unable to make a clear showing that an imminent threat of irreparable harm exists because: (1) the Richmond Advisors have not violated any contractual or common law duty, and there is no evidence that they intend to do so in the future; (2) the alleged wrongdoing has already occurred and cannot be retroactively corrected by an injunction; and (3) the VALIC Companies can be adequately compensated by monetary damages.

**1.     The Richmond Advisors have not improperly solicited their clients, and there is no evidence that they intend to do so in the future.**

To establish a threat of imminent injury, the movant must provide proof that the harm has occurred in the past and show a reasonable likelihood that, without the court's intervention, the same harm is likely to occur again. *Bloodgood v. Garraghty*, 783 F.2d 470, 476 (4th Cir. Va. 1986) (internal quotations omitted); *see also Norfolk & W. Ry. v. Brotherhood of R.R. Signalmen*, 164 F.3d 847, 856-857 (4th Cir. Va. 1998) (dissolving injunction barring unions from striking because the employers failed to show that the unions had acted on a plan to strike or otherwise intended to strike).  The VALIC Companies have not shown that the Richmond Advisors have improperly "solicited" their clients or misused the VALIC Companies' confidential information.  Accordingly, the VALIC Companies fail to make a clear showing that they face an imminent threat, and as a result, the VALIC Companies' request for injunctive relief should be denied. *See, e.g., H.J. Meyers & Co. v. Euripides*, 1996 U.S. Dist. LEXIS 17217, *7-9 (E.D. Va. Mar. 15, 1996) (denying motion for TRO against departing financial advisor because "[t]here is no evidence before the Court that [the financial advisor] violated the terms of the employment agreement between him and [his former employer].");  *Wachovia Securities, LLC., et al., v. Gates, et al.*, 2008 U.S. Dist. LEXIS

- 9 -

32895, *8-9 (E.D. Va. April 21, 2008) (holding that brokerage firm failed to establish an imminent threat because, *inter alia*, its "allegations of wrongdoing are not supported by credible evidence.").

> a.     **The Richmond Advisors have not misused the VALIC Companies' confidential information, or misappropriated the VALIC Companies' trade secrets.**

The VALIC Companies' claim that the Richmond Advisors have misappropriated and misused confidential information is based on unsupported speculation. Indeed, although the VALIC Companies state repeatedly that the Richmond Advisors misused confidential customer information, such bald assertions appear to be premised on two unsupported inferences: (1) that the Richmond Advisors could not have contacted the customers they served for years without taking documents from the VALIC Companies; and (2) that because they accessed information regarding their customers prior to terminating their employment with the VALIC Companies, the Richmond Advisors must have done so for the purpose of stealing the information.

In support of its assertions, the VALIC Companies rely on the Cosby and Zuckero Declarations. Specifically, with respect to the Cosby Declaration, the VALIC Companies make much of the fact that the Richmond Advisors entered the Richmond Office to return their laptops and cell phones and to leave their resignation letters. Cosby Dec. at 10-11. With no evidence or basis whatsoever to claim that the Richmond Advisors removed anything other than their personal items from the office, Cosby nevertheless concludes that because the office has been closed for a year, "it is impossible to determine if they took non-personal items." Cosby Dec. at 11. This conclusion is not only directly rebutted by the Richmond Advisors' Declarations—which confirm that they only removed their personal possessions—but it is also nonsensical. Robertson Dec. at 21; Coreth Dec. at 20; Rawls Dec. at 22. What Cosby fails to acknowledge in her Declaration is that the Richmond Office had been largely paperless for several years. Robertson Dec. at 28; Rawls Dec. at 29. Therefore, if the Richmond Advisors had removed customer information from

the office when submitting their resignations, it necessarily would have required printing or downloading while they were at the office, yet there are no allegations that this occurred.  It should also be noted that it had been the longtime practice at the VALIC Companies for resigning employees to return company issued electronics, and to submit resignation letters, to the Richmond Office.   Robertson Dec. at 7; Coreth Dec. at 7; Rawls Dec. at 7.  At no point in time did the VALIC Companies provide any instructions to employees of the Richmond Office that resignations, and company issued electronics, should be provided to another location or in another manner. *Id.*

The Cosby Declaration makes two additional unsupported assertions regarding potential misappropriation.  The first is that "[c]lients have a concern that these former agents have their personal information."  Cosby Dec. at 24.  Notably this assertion is not attributed to any identified client(s) and appears to be Cosby's pure speculation of what someone else thinks.  Cosby then goes on to claim "[o]ne client called and requested that her funds be transferred and stated that she already had received the rollover/transfer form from her advisor."  Cosby Dec. at 25.  Again, no specifics are provided, and it can be reasonably inferred from the statement that this was a call made to a call center.  Accordingly, not only did Cosby not have this conversation, it cannot be determined whether she even spoke to the call center representative.  Moreover, this assertion appears to depend on the contention that the type of account at issue required transfer paperwork to be provided by the VALIC Companies.  As explained in the Richmond Advisors' Declarations, this is not the case for the VFA brokerage accounts, as account transfer forms are generated and provided by the firm where an account is being transferred. Robertson Dec. at 13; Coreth Dec. at 13; Rawls Dec. at 13. Additionally, with respect to VALIC annuities, the form is provided by VALIC and has a VALIC bar code. Robertson Dec. at 14; Coreth Dec. at 14; Rawls Dec. at 14.

The Zuckero Declaration similarly contains no direct allegations of any wrongdoing by the Richmond Advisors.   To be clear, the Zuckero Declaration refers only to internal downloads of information within the VALIC system and on the VALIC devices.   Zuckero fails to acknowledge the very legitimate business reasons that the Richmond Advisors would have needed to perform these actions, as they had countless times over the years. Robertson Dec. at 25; Coreth Dec. at 25; Rawls Dec. at 25. Moreover, Zuckero does not, and cannot, assert that the Richmond Advisors downloaded or exported any information to a non-company device.   With no evidence of any wrong doing, Zuckero appears to place significance on the letters entered by Rawls and Robertson when asked to provide a business reason for the actions.   However, Zuckero fails to acknowledge that Robertson and Rawls have always simply entered letters when performing the same actions.   Robertson Dec. at 24; Rawls Dec. at 24. Moreover, Rawls and Robertson were instructed by Laura Stocker, the District Office Coordinator, that when asked to provide a business reason for exporting client lists, they should simply type a series of keystrokes.   *Id.*

The Richmond Advisors have not breached any confidentiality obligations to the VALIC Companies, and the VALIC Companies' allegations to the contrary are based solely on hearsay couched in conclusory terms, pure speculation, and an erroneous assertion of fact.  Moreover, the VALIC Companies have failed to make any attempt, let alone a "clear showing," that irreparable harm is imminent, and therefore, its request for injunctive relief should be denied. *See, e.g., H.J. Meyers & Co.*, 1996 U.S. Dist. LEXIS 17217 at *7-9 (denying motion for TRO against departing broker because "[t]here is no evidence before the Court that [the broker] violated the terms of the employment agreement between him and [his former employer]."); *Gates*, 2008 U.S. Dist. LEXIS 32895 at *8-9 (holding that brokerage firm failed to establish an imminent threat of irreparable harm because, *inter alia*, its "allegations of wrongdoing are not supported by credible evidence.").

- 12 -

b.    **The VALIC Companies have produced no evidence that the Richmond Advisors improperly solicited their clients.**

Upon joining CG, the Richmond Advisors contacted their clients as a professional courtesy to explain that they would no longer be handling their accounts for the VALIC Companies, that they had moved to CG and how to contact them, and to answer any questions or concerns the clients may have. Robertson Dec. at 9; Coreth Dec. at 9; Rawls Dec. at 9.  Contacting clients to inform them of a substantial change to their account relationships and to respond to questions does not constitute "solicitation." *See, e.g., H.J. Meyers & Co.*, *supra*, 1996 U.S. Dist. LEXIS 17217 at *7-9 (denying a request to enjoin departing financial advisor from soliciting clients based on a letter from the financial advisor to his clients because the letter did not necessarily constitute impermissible solicitation).  Indeed, the VALIC Companies requested that Mr. Coreth and Mr. Robertson make the same contacts when they joined the VALIC Companies. *see* Robertson Dec. at 10; Coreth Dec. at 10; Rawls Dec. at 10.

The VALIC Companies' contention that the Richmond Advisors improperly "solicited" their clients is based on an hearsay declaration filed by an employee of the VALIC Companies, Elise Cosby.  Cosby states that clients of the VALIC Companies have reported that the Richmond Advisors contacted them by phone and "asked them to move their accounts," but provides no further detail. Cosby Dec., ECF No. 6-1 at 14.  Subsequent paragraphs describe how the Richmond Advisors contacted VALIC clients "regarding [their] separation from VALIC" or "about their departure."  Cosby Dec., ECF No. 6-1 at 15, 16, 18.  Such customer contact is expected in the financial services industry.  *Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 518 (E.D. Va. 1998).

Cosby's declaration should be afforded little weight, if any.  Whereas the Richmond Advisors' declarations are based on their personal knowledge, Cosby's declaration is based entirely on hearsay or even double hearsay.  Hearsay declarations are permitted in injunction

- 13 -

proceedings, but they are deserving of less weight nonetheless. *H.J. Meyers & Co.*, *supra*, 1996 U.S. Dist. LEXIS 17217 at *7 ("An affidavit in support of a temporary restraining order can be based on hearsay. However, the fact that the affidavit is based on hearsay is a factor in determining the evidentiary weight of the affidavit."); *see also Bank of Am. Inv. Servs. v. Byrd,* Civil Action No. 2:09cv211, 2009 U.S. Dist. LEXIS 133322, at *20-21 (E.D. Va. June 13, 2009) (citing cases for the proposition that "courts have nonetheless refused to consider declarations where '[n]othing in the declarations offered by Defendants suggests that the declarants have personal knowledge of [the plaintiff's] conduct . . .') (citations omitted).  Here, Cosby has no personal knowledge of the Richmond Advisors' alleged interactions with their clients.  Moreover, Cosby fails to provide details from her conversations with the Richmond Advisors' clients that support the VALIC Companies' conclusory assertions.  Absent such detail, the VALIC Companies fail to provide reliable evidence contradicting the Richmond Advisors' descriptions of their outreach to clients. *See Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 2009 U.S. Dist. LEXIS 1937, *7-9 (E.D. Va. Jan. 13, 2009) (noting that "courts have refused to consider declarations that do not contain sufficient indicia of reliability … or where nothing in the declarations offered … suggests that the declarants have personal knowledge of the [defendant's] conduct ….") (internal quotations omitted).

Besides relying on conclusory hearsay allegations, Cosby's declaration also omits several material facts bearing on Cosby's credibility.  Cosby accuses the Richmond Advisors of entering the VALIC Companies' Richmond office, thereby violating company policy, and removing items on the day they resigned.  Cosby Dec. at 10, 11.  While the VALIC Companies had prohibited employees from working from the Richmond Office or meeting clients in the Richmond Office, company practice had been to turn in company property (laptops, cell phones, etc.) with a

resignation letter to the Richmond Office.  Robertson Dec. at 7; Coreth Dec. at 7; Rawls Dec. at 7.  The Richmond Advisors dropped off their resignation letters and property of the VALIC Companies, and removed personal items—picture frames, diplomas, and the like—from their offices.  Robertson Dec. at 21; Coreth Dec. at 20; Rawls Dec. at 22.  Additionally, while Cosby asserts that Rawls corresponded with a client of the VALIC Companies regarding a recently-created account and asked her to call him on a telephone number not associated with the VALIC Companies, representatives of the VALIC Companies frequently corresponded with clients using their cell phones.  Robertson Dec. at 19; Rawls Dec. at 19.  In fact, Rawls used his cell phone to speak with clients roughly half the time.  Rawls Dec. at 19.  Finally, with regard to the "logistics" Cosby referenced, Rawls never discussed with any clients his intention to leave the VALIC Companies or his potential employment with CG prior to his resignation. Cosby Dec. at 13; Rawls Dec. at 21.

Similar to the Cosby Declaration in its lack of first-hand knowledge, the Zukero Declaration mischaracterizes the Richmond Advisors' legitimate business activities as efforts to impermissibly solicit their clients.  The Zukero Declaration alleges that (1) the Richmond Advisors exported client lists during December of 2020 and January of 2021; (2) Robertson and Rawls did not type in a business purpose for those exports; and (3) the Richmond Advisors made numerous client searches on AGILEnet on February 4 and 5, 2021; and (4) the Richmond Advisors printed certain documents to PDF between February 1 and February 5, 2021.  Zukero Dec. p. 33; 35-36; 37; 38.  The Richmond Advisors do not dispute these facts.  The Richmond Advisors exported client lists in late 2020 and early 2021 for legitimate business purposes, including the regular servicing of client accounts, just as they had throughout their employment.  Robertson Dec. at 25; Coreth Dec. at 25; Rawls Dec. at 25.  Notably, the Zukero Declaration does not discuss earlier

exports of client lists.  Additionally, the Zukero Declaration does not allege that the Richmond Advisors used a removable storage device or other method to remove the client lists from the laptop provided by the VALIC Companies, and the Richmond Advisors did not do so.  Robertson Dec. at 24; Coreth Dec. at 24; Rawls Dec. at 24.   With regard to the assertion that Robertson and Rawls did not type in a business purpose for the exports, this does not suggest that they did not have a legitimate business purpose for the exports.   In fact, an employee of the VALIC Companies, Laura Stocker, instructed Robertson and Rawls that they could type anything at all into the query box, and a review of their past exports would demonstrate this was their regular practice.  *Id.* Notably, the VALIC Companies failed to specify what business purpose Coreth asserted for his download of December 2, 2020.  Finally, the Richmond Advisors' performing client searches on AGILEnet does not suggest that they solicited their clients, as the Richmond Advisors regularly searched for client information on AGILEnet.  Robertson Dec. at 25; Coreth Dec. at 24; Rawls Dec. at 25.   In sum, the Zukero declaration does not establish that the Richmond Advisors committed any wrongdoing.

Considering that the declarations supporting the VALIC Companies' Motion rely on hearsay, lack critical details, and omit material facts, "[the VALIC Companies'] allegations of wrongdoing are not supported by credible evidence." *Gates*, *supra*, 2008 U.S. Dist. LEXIS 32895 at *8.  While the VALIC Companies attached to their Memorandum several orders granting preliminary injunctions sought by the VALIC Companies around the country, the case at hand appears to be most similar to *VALIC v. Laeng*, 2013 U.S. Dist. LEXIS 108869, at *3 (M.D. Fla. Aug. 2, 2013)[2], in which the court denied a preliminary injunction.  Just as in *Laeng*, here the VALIC Companies have produced no evidence that the departed financial advisors removed trade

---

[2] The *Laeng* opinion, as well as the Report and Recommendation on which it relies, are attached here as Exhibit E.

secrets belonging to the VALIC Companies or solicited their clients, and no evidence to demonstrate that account transfers resulted from any improper solicitation. *Id.* at *7-9.

> ### 2. Even if the Richmond Advisors had improperly "solicited" their clients, the solicitation has already occurred and cannot be retroactively remedied by an injunction.

Even if the Richmond Advisors had improperly "solicited" their clients, the VALIC Companies still cannot make a clear showing of an imminent threat. This is not a case where a firm discovers that a departing financial advisor is in the process of contacting clients and then immediately seeks court intervention to prevent further contact. Rather, upon learning that the Richmond Advisors had entered the offices of the VALIC Companies, resigned, and then contacted their clients, the VALIC Companies waited two months to commence this matter and move for injunctive relief. The VALIC Companies' delay reflects the inescapable conclusion that two months after the Richmond Advisors contacted their clients, the VALIC Companies can no longer face an imminent threat. Confirming this point, the VALIC Companies make no effort to show that any future contact with clients is imminent, identifying only perceived prior contacts and making the assumption that these contacts already led to transfers.

"[I]njunctive relief addresses imminent injury, not harm that occurred in the past …." *Gates*, *supra*, 2008 U.S. Dist. LEXIS 32895 at *9. Because the alleged solicitation occurred more than two months ago, the VALIC Companies' request for injunctive relief addresses a harm that occurred in the past, not one that is imminent. Therefore, "issuing an injunction would not be appropriate." *Id.* (denying motion for preliminary injunction and TRO against several BAI financial advisors and noting that the advisors "are now employed by another bank, and their customers are aware of that fact.").

       3.       **The VALIC Companies can be adequately compensated by monetary damages.**

Assuming that the VALIC Companies could demonstrate imminent harm, they are nevertheless unable to make a clear showing that such harm is irreparable.  The fact that the VALIC Companies were able to proceed for two months without seeking injunctive relief significantly undercuts their claim of irreparable harm.  *See Scott v. WFS Fin., Inc.*, 2007 U.S. Dist. LEXIS 3967, *27 (E.D. Va. Jan. 18, 2007) ("Plaintiff's delay in moving for an injunction supports the conclusion that Plaintiff's harm is not irreparable.").  In any event, the VALIC Companies' claim of irreparable harm is conclusively precluded by the availability of monetary damages.

It is well-established that irreparable harm does not exist if the party seeking injunctive relief can be adequately compensated through monetary damages.  *Accord Hughes Network Systems, Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("[W]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable."); *see also WFS Fin., Inc.*, 2007 U.S. Dist. LEXIS 3967 at *26-27 ("In general, the possibility of compensation through a judgment awarding money damages means that the harm is not irreparable.") (citing *Hughes Network Systems*).  This maxim is especially pertinent in departing financial advisor cases, where courts have made clear that injury from lost customers is easily compensated through monetary damages:

> The cognizable injury to brokerage firms such as Plaintiff is lost commissions. Money damages easily compensate Plaintiffs for this type of loss.
>
> The securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from Morgan Stanley is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants Frisby and Lovell doing business with those customers that Morgan Stanley considers its own can be traced precisely. Any loss Morgan Stanley might suffer as a result of

> Defendants' departure is calculable.  Plaintiff has failed to demonstrate irreparable harm if a temporary restraining order is not issued.

*Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1376 (D. Ga. 2001) (citation omitted).

*See also Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998) (loss of customers "can be quantified, and [the broker-dealer] can be substantially compensated with monetary damages for those losses."); *Advanced Marine Enters. v. PRC, Inc.*, 256 Va. 106, 120-121, 501 S.E.2d 148, 156-157 (1998) (affirming methodology for determining damages for loss of goodwill resulting from departing employees).

In the departing financial advisor cases cited above, the solicitation had not yet occurred. By contrast, the VALIC Companies assert that the Richmond Advisors have already "solicited" their clients. Memo. in Supp., ECF No. 6, pages 2-3, 10-11. Thus, it is even clearer here that the VALIC Companies can "be fully compensated by a monetary award at judgment." *WFS Fin., Inc.*, 2007 U.S. Dist. LEXIS 3967 at *27.   Therefore, the VALIC Companies cannot demonstrate irreparable harm, and as a result, are not entitled to injunctive relief. *See Id.* (denying motion for preliminary injunction).

**B.   The disproportionate harm to the Virginia Advisors weighs against issuing injunctive relief.**

The harm to the VALIC Companies if an injunction does not issue must be balanced with the harm to the Richmond Advisors if an injunction does issue.  As discussed *supra*, the VALIC Companies are not facing an imminent threat, but even if the alleged harm were somehow imminent, the purported injury is not irreparable and can easily be compensated through monetary damages.  Furthermore, the VALIC Companies have already managed to endure for more than two months without an injunction, which is not surprising given the unsupported allegations set forth by the VALIC Companies and considering that the VALIC Companies have more than 100

billion in total assets.  Clearly, the harm to the VALIC Companies if an injunction does not issue is minimal.

By contrast, if an injunction does issue, the harm to the Richmond Advisors is substantial. The VALIC Companies seek to leave the Richmond Advisors "with no client base in a business that thrives on commissions from regular clients." *Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998) (denying request to enjoin departing financial advisor) (internal quotations omitted).  The effect of such a prohibition on individual financial advisors like the Richmond Advisors is devastating, particularly when considering the minimal harm to be suffered by the VALIC Companies.  As one court reasoned in a similar context involving a different financial services firm:

> If an injunction were to issue, damage to Mr. de Liniere while he waited ultimately to prevail would be catastrophic as a result of the loss of most of his income. Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on Mr. de Liniere than on Merrill Lynch, that disparity of affecting supports denial of an injunction.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. De Liniere*, 572 F. Supp. 246, 249 (D. Ga. 1983). Moreover, the Richmond Advisors have not breached any of their obligations to the VALIC Companies.  Accordingly, an injunction or TRO would effectively prohibit the Richmond Advisors from "engaging in legitimate commercial activities." *Gates*, *supra*, 2008 U.S. Dist. LEXIS 32895 at *9 (denying request to enjoin departing financial advisor).  "Because the effect of the loss of income pending the outcome of this dispute would bear far more heavily on [the Richmond Advisors] than [the VALIC Companies], that disparity of effect supports the denial of an injunction." *Prudential Sec.*, 8 F. Supp. 2d at 519 (internal quotations omitted).  Therefore, the VALIC Companies' request for injunctive relief should be denied.

**C.**     **The VALIC Companies are not likely to succeed on the merits of their claims because the Richmond Advisors have not violated any of their obligations, and because the non-solicitation covenants are unenforceable as a matter of law.**

**1.**     **The VALIC Companies cannot demonstrate a likelihood of success on the merits because the VALIC Companies cannot show that the Richmond Advisors have breached any agreement.**

The VALIC Companies' failure to make a <u>clear showing</u> of irreparable harm is sufficient, by itself, to justify denial of a preliminary injunction. *Scott v. WFS Fin., Inc.*, 2007 U.S. Dist. LEXIS 3967, *27 (E.D. Va. Jan. 18, 2007) (citing *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1992)).  The VALIC Companies' request should also be denied, however, because the VALIC Companies cannot demonstrate that they are likely to succeed on the merits of their claims against the Richmond Advisors.   Indeed, as discussed *supra*, the Richmond Advisors have not breached any duty owed to the VALIC Companies.  Furthermore, assuming that Cosby's, Meinbresse's, and Zukero's Declarations are somehow considered to be sufficiently reliable and credible to create a genuine dispute over the Richmond Advisors' conduct, the fact that there is a dispute in the first place precludes the VALIC Companies from showing that it is likely to succeed on the merits. *See, e.g., General Electric Co. v. American Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. Ill. 1956) ("An injunction *pendente lite* should not issue where the parties are in serious dispute on conflicting question of fact."); *Howerton v. Grace Hosp., Inc.*, 1991 U.S. Dist. LEXIS 19451, *6-7 (W.D.N.C. Mar. 14, 1991) (disputed questions of fact on a motion for preliminary injunction cast doubt as to the probability of success, and thus as to the propriety of granting injunctive relief) (internal citations omitted).

2.      **The VALIC Companies cannot demonstrate a likelihood of success on the merits because the non-solicitation covenants are unenforceable as a matter of law.**

The VALIC Companies are also unable to show a likelihood of success, as the non-solicitation covenants upon which their claims are based are unenforceable.  Absent a binding post-employment non-solicitation covenant, the Richmond Advisors are not prohibited from soliciting their clients. The VALIC Companies allege that the Richmond Advisors are bound by the non-solicitation covenant within the Financial Professional Agreement (the "Non-Solicit"). *See* the VALIC Companies Mem. in Supp. at 22-26.  The FP Agreement includes a Texas choice of law clause.  Cosby Dec., Attachment A, page 18; Attachment B, page 41; Attachment C, page 64.

In the Free Enterprise and Antitrust Act, the Texas Legislature declared that "'[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful.'" *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 770 (Tex. 2011) (quoting Tex. Bus. & Com. Code § 15.05(a)). The Supreme Court of Texas has concluded that covenants limiting employees' professional mobility are unlawful restraints of trade under this statute unless they fall within the exception created by the Covenants Not to Compete Act. *Id.* at 768, 770; *see also id.* at 782 (Willett, J., concurring in judgment). As the court explained, "[u]nreasonable limitations on employees' abilities to change employers . . . could hinder legitimate competition between businesses and the mobility of skilled employees." *Id.* at 769. The Covenants Not to Compete Act provides that a covenant is enforceable only if (among other things not at issue in this case) "it contains limitations as to time, geographic area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a); *see* Tex. Bus. & Com. Code § 15.51(c); *see also Marsh*, 354 S.W.3d at 777 ("The hallmark of enforcement is whether or not the covenant is reasonable.").  If a covenant not to

- 22 -

compete is not reasonable, the trial court must reform it to the extent necessary to make it reasonable. Tex. Bus. & Com. Code Ann. § 15.51(c). Once it reforms a covenant not to compete, the trial court cannot award damages for injuries incurred from violation of the covenant before it was reformed. *Id.*

The Non-Solicit purports to bar the Richmond Advisors, for a period of one year after the termination of the FP Agreements, from soliciting a Protected Customer "to end or alter Protected Customer's relationship with any Protected Company." FP Agreement, Docket 6-1 Exhibit A, B, and C. While this restriction could theoretically be reasonable, the definitions of "Protected Customer" and "Territory" are ambiguous and overbroad, rendering the Non-solicit unenforceable. Protected Customer, for the purpose of analyzing individual solicitation, is defined in the FP Agreements as:

> "any person who is or was a customer of any Protected Company who was within Financial Professional's assigned Territory or, with respect to a customer outside the Territory, for which the Financial Professional was assigned, and who, within the one-year period immediately preceding the termination of this Agreement, was either assigned to Financial Professional or with whom Financial Professional communicated regarding Protected Companies' products or services. . ."

> Cosby Dec., Attachment A, page 20; Attachment B, page 44; Attachment C, page 66.

This definition is subject to multiple interpretations, as evidenced by the fact that the VALIC Companies have attempted to modify its language in the pleadings submitted to this Court:

> "any person who is or was a customer of the VALIC Companies and who was within Defendants' assigned territory (the Virginia District of the Atlantic Region) and was assigned to or communicated with Defendants regarding the VALIC Companies' services and products at any time during the one-year period immediately preceding the termination of the FP Agreement."

Memorandum in Support, Page 7. The VALIC Companies' own interpretation, which attempts to severely limit its scope, clearly cannot be correct, as the definition of "Protected Customer" in the

FP Agreements states that the restriction will apply to customers "outside the Territory." Additionally, the definition of Protected Customer appears to provide that a person who "is or was a customer of any Protected Company who was within Financial Professional's assigned Territory," but who was not assigned to or and who did not communicate with the Financial Professional, is a Protected Customer.  This imprecise drafting, or unjustifiable restraint, renders the Non-solicit ambiguous at best, and overly restrictive at worst, and unenforceable.

Similarly, while the VALIC Companies' rewriting of the Non-Solicit presumes that Virginia was their "Territory," the FP Agreement makes no attempt to define the Richmond Advisors' territory as Virginia—or any other geographic area.  Instead, "Territory" is broadly defined to mean "any geographical description, or any customer, group, or service assignment, or any combination thereof."  Pursuant to this definition of Territory, the Richmond Advisors' territory could just as easily be the Atlantic Region, or defined by the customers with whom they worked—presumably leaving the advisor to guess what was intended.  Indeed, Mr. Coreth had customers in four states and Mr. Roberston is licensed in 11 states.  Coreth Dec. at 19, Robertson Dec. at 20.  The vague and undefined nature of the FP Agreements' definitions of "Protected Customer" and "Territory," and the corresponding uncertainty associated with these terms, renders the Non-Solicit ambiguous and unenforceable.  *See Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.,* 468 S.W.3d 200, 205 (Tex. App. 2015) (stating that a contract is ambiguous if it is susceptible to more than one reasonable interpretation); *see also Power Distribution, Inc. v. Emergency Power Eng'g, Inc.*, 569 F. Supp. 54, 58 (E.D. Va. 1983) (parsing an ambiguous restrictive covenant, describing the *in terrorem* effect on the employee, and stating that "the mere act of subjecting the employee to such uncertainty offends 'sound public policy'")(citations omitted).

Additionally, the definition of "Territory" renders the Non-Solicit overbroad.  While the VALIC Companies state that "the geographic limitation is reasonable because it is limited to the territory in which each Defendant works—Virginia," this limitation is not set forth in the FP Agreements.  Moreover, none of the Richmond Advisors were assigned to the "territory" of Virginia, and, by way of example, Mr. Coreth had clients in Virginia, in North Carolina, Maryland, and Arkansas.  Robertson Dec. at 20; Coreth Dec. at 19; Rawls Dec. at 20.  Pursuant to Texas law, the territory in which the employee worked for an employer is generally considered to be the benchmark of a reasonable geographical restriction. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ). "Noncompete covenants with broad geographical scopes have been held unenforceable, particularly when no evidence establishes that the employee actually worked in all areas covered by the covenant." *Zep Mfg. Co.*, 824 S.W.2d at 661.  Here, where "territory" is not specifically defined, there can be no doubt that the provision is overly broad.  Additionally, even if territory was simply identified as Virginia, the VALIC Companies have presented no evidence that the employee worked in all areas of Virginia. Accordingly, the covenant is broader than reasonably necessary to protect the interests of the employer and is therefore unenforceable.  *See TENS Rx, Inc. v. Hanis, No. 09-18-00217-CV, 2019 Tex. App. LEXIS 10563, at *12 (Tex. App. Dec. 5, 2019)* (invalidating a restrictive covenant where there was "no definite territory stated and no evidence that [the employee] worked in all areas covered by the covenant").

Finally, the Non-Solicit is also unenforceable because it purports to restrict the Richmond Advisors from soliciting the clients they cultivated prior to working with the VALIC Companies, and before they had access to the confidential and proprietary information of VALIC.  Mr. Coreth

and Mr. Robertson cultivated client relationships prior to working with the VALIC Companies. Robertson Dec. at 8; Coreth Dec. at 8.  As the VALIC Companies can have no legitimate business interests in prohibiting the Richmond Advisors from soliciting their pre-existing relationships— which includes their own family members—this is unreasonable.  *See Birk v. Hub Int'l Sw. Agency, Ltd., No. EP-08-CA-259-FM, 2009 U.S. Dist. LEXIS 50221, at \*70 (W.D. Tex. Apr. 1, 2009)* (blue-penciling a non-solicitation provision to permit former employee to solicit his pre-existing book of business).

As illustrated above, there are substantial questions regarding the ability of the VALIC Companies to succeed on their claims against the Richmond Advisors.  Whether the VALIC Companies will succeed on the merits of its claims remains to be seen before the FINRA arbitration panel.  At this point, however, the VALIC Companies simply cannot demonstrate that they are likely to succeed on the merits.  Therefore, the VALIC Companies' request for injunctive relief should be denied.

> **D.**   **Granting the VALIC Companies' request for injunctive relief is contrary to the public's interest.**

The final factor to be considered in determining whether to grant the VALIC Companies' request for injunctive relief is whether the requested injunction serves the public interest. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991).  Awarding an injunction based on the Non-Solicit is most definitely not in the public's interest for two primary reasons. First, in Virginia, enforcement of a restraint on trade, such as the Non-Solicit, is disfavored. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc., 270 Va. 246, 249, 618 S.E.2d 340 (2005).* More importantly, however, enforcing the Non-Solicits in the manner requested by the VALIC Companies is not in the public's interest because of the effect it would have on the public itself.

- 26 -

An important relationship exists between an investor and his or her financial advisor.  As one court in this district has observed, "[a] broker-client relationship, like a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust." *Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998).  Indeed, asking another to protect one's financial assets is an inherently frightening endeavor that requires trust and confidence in another's judgment and skills.  Thus, it is not surprising that many investors develop a deeply personal relationship with their financial advisor.

Given this unique and important relationship between a financial advisor and his clients, "[c]lients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover." *Id.* at 521.  Because the client should decide who will manage his or her account, it follows that "the public has a greater interest in being able to choose whether to follow its financial advisor to a new firm or to remain at the old firm with a new broker." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Liniere*, 572 F. Supp. 246, 249 (D. Ga. 1983). Conversely, "[t]he public has little interest in having its choice restricted to brokers other than the one that has served them …" *Id*.

The injunctive relief requested by the VALIC Companies, however, will restrict the ability of the Richmond Advisors' clients to continue advisor relationships that have been, in some instances, decades long.  Robertson Dec. at 8.  The VALIC Companies ask that the Richmond Advisors be prohibited from contacting their clients. Motion, Docket No. 5, ¶1(a).  In *Wachovia Securities, LLC., et al., v. Gates, et al.*, 2008 U.S. Dist. LEXIS 32895, *11 (E.D. Va. April 21, 2008), a court in this district refused to grant the injunction sought by a brokerage firm to enforce non-solicitation agreements against departing brokers because granting such relief "would restrict

those customers' choices, and thus would not serve the public interest." Likewise, the public's interest is not served by enjoining the Richmond Advisors and restricting their clients' ability to choose who will service their accounts.

Remarkably, VALIC Companies further seek to interfere with the relationship between the Richmond Advisors and their clients by requesting that the Richmond Advisors—"whether alone or in concert with others, including any officer, agent, employee and/or representative of Defendants' broker-dealer"—be enjoined from "processing any change of broker-dealer forms signed by Protected Customers until such time as customer's knowing choice can be confirmed." Motion, Docket No. 5, ¶ 3.  In other words, the VALIC Companies wish to stop any transfer of business from the VALIC Companies to CG, regardless of whether such transfers regardless of the circumstances surrounding such transfer.   Such broad interference is not only contrary to the public's interest, it is expressly prohibited by the FINRA Code of Arbitration.

FINRA Rule 2140, a copy of which is attached as Exhibit A, provides that "[n]o member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative …."  Rule 2140 provides further that "[p]rohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account." *Id.*  Yet, this "prohibited interference" is precisely what the VALIC Companies request when they ask that the Richmond Advisors (and unnamed people/entities working on their behalf) be enjoined from "processing any change of broker-dealer forms signed by Protected Customers until such time as customer's knowing choice can be confirmed" Motion, Docket No. 5, ¶ 3.

Ultimately, "**it is the client who owns the investment relationship, not [the VALIC Companies].**" *Am. Express Financial Advisors, Inc. v. Hazelwood,* 2005 U.S. Dist. LEXIS 43262, *25 (D. Ark. July 19, 2005) (emphasis added).   Accordingly, the Non-Solicit should not be enforced so as to "affect [the Richmond Advisors'] customers, who were not parties to those agreements." *Gates*, 2008 U.S. Dist. LEXIS 32895 at *10.   Instead, "[t]he people who [the Richmond Advisors'] served [should be] free to maintain their relationships with [the Richmond Advisors], even if doing so means transferring their accounts to another financial institution." *Id.* at *10-11.   Therefore, the VALIC Companies' request for a temporary restraining order barring the Richmond Advisors from contacting their clients and from continuing to service their clients should be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Charles Coreth, Michael Rawls, and Thomas Robertson, by counsel, respectfully requests that the Plaintiffs' request for injunctive relief be denied, that this matter be dismissed with prejudiced, and that this Court award any additional relief it deems fair and reasonable.

Respectfully Submitted,

CHARLES CORETH
MICHAEL RAWLS
AND
THOMAS ROBERTSON

By Counsel

_____*/s/ Lauren E. Fisher White*_____
Henry I. Willett III (VSB No. 44655)
Lauren E. Fisher White (VSB No. 80360)
CHRISTIAN & BARTON, L.L.P.
901 East Cary Street, Suite 1800
Richmond, Virginia 23219-4037
Phone: (804) 697-4130

Facsimile: 804) 697-6130
HWillett@cblaw.com
LFWhite@cblaw.com

*Counsel for Defendant*


CERTIFICATE OF SERVICE

      I hereby certify that on the 12th day of April, 2021, the foregoing *Memorandum* was electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

         Charles M. Sims (VSB No. 35845)
         O'Hagan Meyer PLLC
         411 E. Franklin Street, Suite 500
         Richmond, Virginia 23219
         Telephone: (804) 403-7100
         Facsimile: (804) 403-7110
         csims@ohaganmeyer.com

         Matthew I. Penfield (pro hac admission pending)
         Bressler, Amery & Ross P.C.
         2001 Park Place, Suite 1500
         Birmingham, Alabama 35203
         Telephone: (205) 729-0400
         Facsimile: (205) 719-0500
         mpenfield@bressler.com

         *Counsel for Plaintiffs The Variable Annuity Life Insurance Company and VALIC Financial Advisors, Inc.*


      */s/ Lauren E. Fisher White*
Henry I. Willett III (VSB No. 44655)
Lauren E. Fisher White (VSB No. 80360)
CHRISTIAN & BARTON, L.L.P.
901 East Cary Street, Suite 1800
Richmond, Virginia 23219-4037
Phone: (804) 697-4100
Facsimile: 804) 697-4112
HWillett@cblaw.com
LFWhite@cblaw.com

*Counsel for Defendants*

- 30 -