IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE VARIABLE ANNUITY LIFE
INSURANCE COMPANY, *et al.*,

     Plaintiffs,

v.                                    Case No. 3:21cv223

CHARLES CORETH, *et al.*,

     Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' The Variable Annuity Life Insurance Company ("VALIC") and VALIC Financial Advisors, Inc. ("VFA") (collectively, the "VALIC Companies") Motion and Application for Temporary Restraining Order (the "Motion"). (ECF No. 5.) In the Motion, the VALIC Companies move this Court to enter a temporary restraining order ("TRO") and preliminary injunction against Defendants Charles Coreth, Thomas Robertson, and Michael Rawls (collectively, the "Former Advisors") to prevent them from misappropriating the VALIC Companies' trade secrets and soliciting the VALIC Companies' clients. (Mot. 2, ECF No. 5.) The Former Advisors responded to the Motion, (ECF No. 17), and the VALIC Companies replied, (ECF No. 18). The Parties appeared before the Court on April 16, 2021, for a hearing on the Motion.

This matter is ripe for disposition.  The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[1] and 1332(a) and (d).[2]  For the reasons that follow, the Court will grant in part the Motion.

## I. Factual and Procedural Background

This eight-count action arises from three former employees' conduct before and after their resignations from VFA, which coincided with the departure of dozens of clients from the VALIC Companies to the former employees' new employer, a direct competitor of the VALIC Companies.  The VALIC Companies allege that before their departure, the Former Advisors misappropriated trade secrets and continue to use that information to solicit the VALIC Companies' clients.  (Compl. ¶¶ 1–71.)  The VALIC Companies seek injunctive relief as to three counts:  breach of contract (Count I); violation of the Virginia Uniform Trade Secrets Act (the "VUTSA") (Count II); and violation of the federal Defend Trade Secrets Act (the "DTSA") (Count III).[3]

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The VALIC Companies bring a claim under Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*  (Compl. ¶¶ 84–91, ECF No. 1.)

[2] "The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A).  The VALIC Companies, citizens of Texas, bring this eight-count action against the Former Advisors, citizens of Virginia.  (Compl. ¶¶ 4–6.)  The Complaint seeks an injunction and involves objects valued in excess of $75,000.  (*Id.* ¶ 2.)  The Court exercises diversity jurisdiction over the VALIC Companies' claims arising under Virginia and Texas law.  *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States.").

[3] The five counts not at issue are:  breach of fiduciary duty (Count IV); tortious interference with contract and business expectancy (Count V); violation of the Computer Fraud

A.     **Factual Background**

1.     **The VALIC Companies' Business**

VALIC specializes in marketing "retirement plans, including fixed and variable annuity contracts," to tax-exempt organizations under § 403(b) of the Internal Revenue Code in the healthcare, education (such as school systems), and government sectors.  (Compl. ¶ 7.) According to Elise Cosby, the District Vice President of VFA's Richmond office, "VALIC's model in working with 403(b) clients is unique in the industry."  (Mem. Supp. Mot. Ex. 1 "Declaration of Elise Cosby" ¶¶ 1, 10, ECF No. 6-1.).  Andrew Meinbresse, the Regional Vice President of the Atlantic Region for VFA, continues, "[A]nnuity products become profitable only after they have been held by a client for several years," so "maintenance of long-term relationships with clients is vital to VALIC's success."  (Mem. Supp. Mot. Ex. 2 "Declaration of Andrew Meinbresse" ¶ 16,[4] ECF No. 6-2.)  Accordingly, "VALIC has spent considerable time and resources over the decades to establish its client base in the annuities market."  (Compl. ¶ 9.)

_____

and Abuse Act (Count VI); conspiracy (Count VII); and business conspiracy, in violation of Virginia Code §§ 18.2-499 and 18.2-500 (Count VIII).  (*See* Compl. ¶¶ 92–122.)

In a footnote in their brief, the VALIC Companies assert that they are likely to succeed on the merits of their claims of breach of fiduciary duty (Count IV), tortious interference (Count V), violation of the Computer Fraud and Abuse Act (Count VI), and conspiracy (Count VII).  (Mem. Supp. Mot. 21 n.5, ECF No. 6.)  The VALIC Companies, however, do not present any analysis of those claims.  Accordingly, the Court does not address them in this memorandum opinion, especially because, as the Court finds below, the VALIC Companies are likely to succeed on the merits of the three counts that they do present in their brief:  breach of contract (Count I); violation of the VUTSA (Count II); and violation of the DTSA claims (Count III).  (*See id.* 15–26.)  Finding a likelihood of success on only one claim is sufficient "to justify injunctive relief."  *W. Indus.-N., LLP v. Lessard*, No. 1:12cv177, 2012 WL 859459, at *5 (E.D. Va. Mar. 13, 2012).

[4] Meinbresse's declaration labels two paragraphs as "16."  (*See* Decl. Meinbresse 3, 5.) The Court refers to the first of those two paragraphs here.

VALIC employs financial advisors and "appoints them to service the VALIC Companies' clients in a defined territory." (*Id.* ¶ 8.)  Financial advisors advise "clients on products and services that are available within a client's applicable plan." (*Id.*)  "They also offer other advice based on each client's needs through VALIC's wholly-owned subsidiary, VFA, a broker-dealer." (*Id.*)

To support their advisors, the VALIC Companies grant them access to "confidential and proprietary information," including "compilations of personal and financial information of the VALIC Companies' clients embodied in computer software systems and databases." (*Id.*)  One such database is AGILEnet, which "compiles and updates on a daily basis client information." (*Id.* ¶ 19.)  The client information stored on AGILEnet includes "contact information, social security numbers, account balances, surrender values, maturity dates, flow status, past and present product investments, investment performance data, investment histories, demographic information, and consumer preferences." (*Id.*)

The VALIC Companies aver that their "detailed client information, which is compiled over many years at substantial expense, constitutes the VALIC Companies' trade secrets and confidential and proprietary information." (*Id.* ¶ 20.)  According to VALIC, a "competitor armed with this information, such as maturity dates, account balances, and the like, can target the VALIC Companies' most valuable and valued clients." (*Id.* ¶ 21.)

To keep their compilations of client information confidential, the VALIC Companies deploy certain safeguards.  For instance, "[s]everal layers of passwords protect the VALIC Companies' databases, and employee access to these databases is limited to a need-to-know basis." (*Id.* ¶ 22.)  The databases also restrict each advisor's access to only "those customers assigned to an advisor within his or her respective territory." (*Id.*)  Further, when an advisor

attempts to export information from AGILEnet, the system prompts the advisor with a warning message. (*Id.*) AGILEnet also requires financial advisors to state a business reason when exporting data from the database. (*Id.* ¶ 42.) Finally, as a condition of employment, each advisor must execute a financial professional agreement ("FPA"), which includes several provisions to preserve the confidentiality of proprietary client information belonging to the VALIC Companies. (*See id.* ¶¶ 25–33.)

### 2.    The Former Advisors' Employment at the VALIC Companies

The VALIC Companies previously employed the Former Advisors. In 1987, Robertson began his employment with VALIC as a financial advisor. (Resp. Ex. 2 "Declaration of Thomas Robertson" ¶ 3, ECF No. 17-2.) On June 29, 2020, Robertson executed an FPA with the VALIC Companies.[5] (Compl. Ex. 1 "Robertson FPA" 19, ECF No. 1-1.) In November 2008, Coreth began his employment with VALIC as a financial advisor. (Resp. Ex. 3 "Declaration of Charles Coreth" ¶ 3, ECF No. 17-3.) On June 24, 2020, Coreth executed an FPA with the VALIC Companies. (Compl. Ex. 2 "Coreth FPA" 19, ECF No. 1-2.) In February 2014, Rawls began his employment with VALIC as a financial advisor. (Resp. Ex. 4 "Declaration of Michael Rawls" ¶ 3, ECF No. 17-4.) On June 29, 2020, Rawls executed an FPA with the VALIC Companies. (Compl. Ex. 3 "Rawls FPA" 19, ECF No. 1-3.)[6]

"By affixing their signatures to the FPAs, [the Former Advisors] acknowledged and agreed that during the term of the FPA, they would have access to and become familiar with" the

---

[5] For all the Former Advisors, the FPAs superseded prior agreements not at issue in this matter. (*See, e.g.*, Robertson FPA § II.B.)

[6] The Robertson FPA, Coreth FPA, and Rawls FPA contain identical provisions. For the sake of brevity, the Court will refer to the Former Advisors FPAs collectively.

VALIC Companies' "trade secrets and confidential and proprietary information." (Compl. ¶ 27.)
In consideration of their continued access to this valuable information, the Former Advisors
agreed to and acknowledged four provisions of the FPAs relevant to the present dispute.

First, the Former Advisors "promised that they would not [Misappropriate] confidential
and proprietary information or trade secrets during the term of the FPAs *or at any time after their
termination*" (the "Misappropriation Provision").[7] (*Id.* ¶ 28 (emphasis added).) The FPAs
define "Misappropriate" as the acquisition, disclosure, or use of the VALIC Companies' "Trade
Secret, Confidential and Proprietary Information, and/or Nonpublic Personal Information
acquired through Improper Means." (FPAs § IX.J.) The agreements further define "Improper
Means" as any "acquisition or use of a Trade Secret, Confidential and Proprietary Information,
and/or Nonpublic Personal Information . . . for any purpose other than in furtherance of the
Financial Professional's duties undertaken on behalf of a Protected Company," which includes
VALIC and VFA. (*Id.* § IX.H.) As defined in the FPAs, "Trade Secret" includes "customer

---

[7] The Misappropriate Provision reads, in pertinent part:

> Financial Professional acknowledges that immediately upon execution of this
> Agreement, Financial Professional will acquire (or will be allowed continued)
> access to the Protected Companies' Property, Trade Secrets, Confidential and
> Proprietary Information, and Nonpublic Personal Information, under circumstances
> that give rise to a duty to maintain their secrecy and limit their use. Accordingly,
> during the term of this Agreement and at all times after its termination, Financial
> Professional agrees to . . . maintain the confidentiality of the Protected Companies'
> Nonpublic Personal Information, Property, Trade Secret, and Confidential and
> Proprietary Information; and . . . not disclose, transfer, or otherwise Misappropriate
> such information in any way, including to or for the benefit of unaffiliated third
> parties.

(FPAs § V.C.3.)

names," "contact information," and "account balances." (*Id.* § IX.W.) In addition, the

Misappropriation Provision specifically provides:

> It shall be deemed a violation of this Agreement for Financial Professional to . . . copy . . . , by any means, format, or device, the Property of the Protected Companies in any manner whatsoever . . . , except in the performance of Financial Professional's authorized duties.

(*Id.* § V.C.3.) "Property shall include anything and everything Financial Professional acquires

by virtue of Financial Professional's employment or other relationship with a Protected

Company, except compensation due to Financial Professional from Financial Professional's

employer." (*Id.* § IX.M.)

Second, the Former Advisors "agreed that they would not, during the term of the FPAs

and for a period of one year after their termination, 'Solicit or Induce, or attempt to Solicit or

Induce, directly or indirectly . . . any Protected Customer to end or alter Protected Customer's

relationship with any Protected Company'" (the "Nonsolicitation of Customers Provision").[8]

(Compl. ¶ 29.) The FPAs define "Solicit" as "to ask for, to make petition, to endeavor or try to

obtain, to call, awake, or excite to action, to appeal to, . . . [or] to invite." (FPAs § IX.S.)

"Induce" in the FPAs means "to affect, encourage, entice, influence, invite, motivate, persuade,

recommend, sway, aid, abet, bring about, cause, effectuate, initiate, instigate, prompt, provoke,

or trigger." (*Id.* § IX.G.)

---

[8] The Nonsolicitation of Customers Provision reads, in pertinent part:

> [D]uring the term of this Agreement and for a period of one (1) year after its termination, Financial Professional agrees not to Solicit or Induce, or attempt to Solicit or Induce, directly or indirectly, for the benefit of Financial Professional or any other person or entity, any Protected Customer to end or alter Protected Customer's relationship with any Protected Company.

(FPAs § V.F.1.a.)

Third, the Former Advisors "agreed that they would not, during the term of the FPA[s] and for a period of one year after their termination, 'directly or indirectly Solicit or Induce or attempt to Solicit or Induce . . . any Financial Professional or other Protected Employee to terminate such Financial Professional or Protected Employee's relationship with Protected Companies" (the "Nonsolicitation of Employees Provision").[9] (Compl. ¶ 30.)

Finally, the Former Advisors "consent[ed] to the entry of a temporary and/or preliminary injunction" for violations of the Misappropriation Provision, Nonsolicitation of Customers Provision, Nonsolicitation of Employees Provision, and the Property-Return Provision because "money damages will be difficult, if not impossible, to estimate" (the "Injunctive Relief Provision").[10] (*Id.* ¶ 35.)

---

[9] This section reads, in relevant part:

> During the term of this Agreement and for a period of one (1) year after its termination, Financial Professional agrees not to directly or indirectly Solicit or Induce or attempt to Solicit or Induce, for the benefit of Financial Professional or other person or entity, any Financial Professional or other Protected Employee, to (i) terminate such Financial Professional or Protected Employee's relationship with Protected Companies or (ii) contract or associate with a competitor or potential competitor of Protected Companies.

(FPAs § V.F.1.c.)

[10] The Injunctive Relief provision reads, in relevant part:

> In the event nay Protected Company files suit or seeks arbitration for violation of any part of this Agreement, including but not limited to Sections V.C., E., and F., above, Financial Professional agrees that money damages will be difficult, if not impossible, to estimate, and that money damages cannot adequately compensate Protected Companies for injuries they will incur as a result of such a violation. Financial Professional consents to the entry of a temporary and/or preliminary injunction, without bond, prohibiting Financial Professional from violating or continuing to violate the provisions of those Sections.

(FPAs § VII.C.)

8

### 3.   The Former Advisors' Resignation and Conduct

On February 5, 2021, at 4:38 p.m., the Former Advisors simultaneously emailed their respective letters of resignation to Cosby, the District Vice President of VFA's Richmond office. (Decl. Cosby ¶¶ 1, 10.) "In the months leading up to their resignation, [the Former Advisors] repeatedly accessed AGILEnet and exported client lists." (Compl. ¶ 37.) Specifically, each Former Advisor completed the following actions:

| | |
|---|---|
| December 2, 2020 | Coreth exported a client list |
| December 15, 2020 | Robertson exported a client list |
| December 15, 2020 | Rawls exported a client list |
| January 8, 2021 | Rawls exported a partial client list |
| January 26, 2021 | Rawls exported a client list |
| January 27, 2021 | Rawls exported a partial client list |

(*Id.* ¶ 38.)

When Rawls exported the list on December 15, 2020, he entered "k" as the business reason. (Mem. Supp. Mot. Ex. 3 "Declaration of Troy Zuckero" ¶ 35, ECF No. 6-3.) The December 15, 2020 export contained all 223 of Rawls's managed investment program clients, whose accounts totaled $61,672,178.48. (*Id.*) For the list Rawls export on January 26, 2021, he entered "asfd" as the business reason. (*Id.* ¶ 36.) The January 26, 2021 export listed all 413 of his guided portfolio services clients, "whose accounts totaled $23,847,865.33." (*Id.*) Finally, for the January 27, 2021 export, Rawls entered "lkj" as the business reason for the export, which consisted of sixteen clients with $2,023,917.28 in assets under management.[11] (*Id.*)

---

[11] The Former Advisors contend that they exported these lists to fulfill their job duties (*e.g.*, sending holiday cards to clients) and did not store the exported information on any device not owned by the VALIC Companies. (Decl. Robertson ¶ 24; Decl. Coreth ¶ 23; Decl. Rawls ¶ 25.) They also contextualize the entry of random keystrokes, claiming that Laura Stocker, the District Office Coordinator, instructed them to do this when exporting client lists. (Decl. Robertson ¶ 24; Decl. Coreth ¶ 23; Decl. Rawls ¶ 25.) The Court need not address these contentions because whether the Former Advisors exported client lists in the months preceding their resignations from VFA does not affect the outcome of this decision.

9

Before their resignations, the Former Advisors accessed AGILEnet for reasons other than downloading client lists. On February 1, 2021, four days before his resignation, "Coreth converted a large amount of VALIC's proprietary forms to PDF format," a download "totaling 295 pages." (Compl. ¶ 44.) From February 2, 2021 to February 5, 2021, "Rawls converted over thirty documents to PDFs." (*Id.* ¶ 45.) In early February 2021, "Robertson also converted numerous documents to PDFs." (*Id.* ¶ 46.) The Former Advisors also "made numerous client searches on AGILEnet on February 4 and 5, 2021, immediately before their resignations." (*Id.* ¶ 43.) "Those searches included accessing client information and account balances."[12] (*Id.*)

The VALIC Companies believe that the forms converted to PDFs are client account transfer forms. (*Id.* ¶¶ 55–56.) According to Meinbresse, the Vice President of VFA's Atlantic Region, clients have submitted transfer requests on forms lacking "the typical pre-printed information and bar code." (Decl. Meinbresse ¶ 14.) Cosby also submits that she spoke with a client who "requested that her funds be transferred and stated that she already had received the rollover/transfer form from her advisor." (Decl. Cosby ¶ 25.)

After the Former Advisors resigned from the VALIC Companies, they "began to work for CG Advisory Services," an investment firm partnered with TD Ameritrade and "a direct competitor" of the VALIC Companies. (Decl. Robertson ¶ 1; Decl. Coreth ¶ 1; Decl. Rawls ¶ 1.) According to the Former Advisors, they "transitioned" to CG Advisory Services "to fulfill their fiduciary duties to their clients," which they maintain they could not do at the VALIC Companies because of the "pressure . . . to utilize VALIC annuity products" that were not in the best interests of their clients. (Decl. Robertson ¶¶ 5–6; Decl. Coreth ¶¶ 5–6; Rawls ¶¶ 5–6.)

---

[12] Coreth and Rawls submit that they "have no recollection of converting any documents to PDF in early 2021." (Decl. Coreth ¶ 25; Decl. Rawls ¶ 27.)

10

After the Former Advisors left for CG Advisory Services, the VALIC Companies have received complaints from customers about the Former Advisors contacting them. (Decl. Cosby ¶ 23.) According to Cosby, the Former Advisors "have been using the word 'fiduciary' often and are scaring clients" during these conversations. (*Id.*)

Much of the Former Advisors' conduct, such as what they did during an unauthorized office visit on February 5, 2021, the day of their resignations, remains contested. The Former Advisors, however, admit to two critical facts about their conduct. First, before resigning from VFA, each Former Advisor concedes he "jotted down the names, addresses, telephone number [sic] and/or email addresses of" certain clients. (Decl. Robertson ¶ 8; Decl. Coreth ¶ 8; Decl. Rawls ¶ 8.) The Former Advisors "have this handwritten list in [their] possession." (Decl. Robertson ¶ 8; Decl. Coreth ¶ 8; Decl. Rawls ¶ 8.) Second, after resigning from VFA, the Former Advisors admit they "contacted those [their former] clients to personally explain that [they] left VFA and joined [CG Advisory Services]" and "answered any questions or concerns they raised." (Decl. Robertson ¶ 9; Decl. Coreth ¶ 9; Decl. Rawls ¶ 9.) The VALIC Companies assert that the Former Advisors are contacting the clients they had at VALIC with the "largest account balances." (Decl. Cosby ¶ 27.)

### 4.  Effect of the Former Advisors' Conduct and the VALIC Companies' Response

Some of VALIC Companies' clients have expressed concern about contact by the Former Advisors. "At least one of the VALIC Companies' 403(b) school system clients . . . has shared concerns about solicitation and the security of [its employees'] personally identifiable information." (Decl. Cosby ¶ 19.) "As recently as March 18, 2021, the VALIC Companies have received complaints [from clients] regarding repeated contact by Rawls," with one client saying that Rawls calls him "a couple of times a week." (*Id.* ¶ 22.)

11

While some VALIC clients have complained about the Former Advisors' contact, others have transferred their accounts to CG Advisory Services.  Between February 5, 2021, and March 25, 2021, seventy-one clients previously assigned to the Former Advisors transferred their accounts to CG Advisory Services.  (*Id.* ¶ 26.)  During the short time the Motion has been pending before the Court, "additional clients have transferred account balances to CG Advisory [Services]," with one client moving $255,000 in assets after the Former Advisors filed their response on Monday, April 12, 2021.[13]  (Reply 3, ECF No. 18.)  According to the VALIC Companies, the total assets transferred to CG Advisory exceeds $45 million, more than $11.6 million of which have been transferred since March 26, 2021.  (Reply Ex. 1 "Supplemental Declaration of Elise Cosby" ¶¶ 5–7, ECF No. 18-1.)  The VALIC Companies contend that the Former Advisors "did not bring [the client] relationships or accounts [at issue] to VALIC from a prior employment relationship."  (Compl. ¶ 16.)

The VALIC Companies have repeatedly notified the Former Advisors of their confidentiality obligations under the FPAs.  On February 8, 2021, Cosby, the District Vice President of VFA's Richmond office, sent a letters to Robertson, Coreth, and Rawls each instructing them to return "all property obtained during [their] relationship with [the VALIC Companies]" and to "[c]omply with the terms of [their] restrictive covenants."  (Reply Ex. 1 "Letter to Thomas Robertson" 6, ECF No. 18-1; *Id.* "Letter to Charles Coreth" 10, ECF No 18-1; *Id.* "Letter to Michael Rawls" 14, ECF No. 18-1.)  On February 12, 2021, Robertson and Coreth acknowledged receipt.  (Letter Robertson 7; Letter Coreth 11.)  On February 17, 2021, Rawls acknowledged receipt.  (Letter Rawls 15.)  A week later, on February 25, 2021, counsel for the

---

[13] During the April 16, 2021 hearing, Counsel for the VALIC Companies stated that one client moved $255,000 in assets after the Former Advisors filed their response on April 12, 2021.

12

VALIC Companies sent a cease-and-desist letter to each Former Advisor. (Compl. ¶ 70; Mem. Supp. Mot. Ex. 6 "Cease-and-Desist Letters I" 2, 6, 10, ECF No. 6-6.) The Former Advisors did not respond. (Compl. ¶ 70.) On March 11, 2021, counsel for the VALIC Companies sent a cease-and-desist letter to Kenneth Evangelista, the Chief Compliance Officer of CG Advisory Services, with the Former Advisors copied. (*Id.* ¶ 71; Mem. Supp. Mot. Ex. 7 "Letter to Kenneth Evangelista" 2, ECF No. 6-7.) No one responded. (Compl. ¶ 71.) Instead, the VALIC Companies assert that the Former Advisors have continued to contact VALIC clients about transferring their accounts, convincing twelve to move their assets from the VALIC Companies during the period "from March 11 to March 25, 2021." (*Id.*)

## B.   <u>Procedural Background</u>

On April 5, 2021, the VALIC Companies filed their twenty-eight-page Complaint in this Court. (ECF No. 1.) That same day, the VALIC Companies filed the Motion, seeking entry of a TRO or preliminary injunction based on three of the eight counts the VALIC Companies bring against the Former Advisors:

**Count I:**   **Breach of Contract (Texas Law):**  Whereas "[t]he VALIC Companies have performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms of the FPAs," the Former Advisors "have violated the contractual obligations contained in their FPAs," and those breaches "have caused and are threatening to cause irreparable harm and loss to the VALIC Companies and could cause the VALIC Companies substantial loss of market share and goodwill so as to warrant injunctive relief;"

**Count II:**   **Misappropriation of Trade Secrets (Virginia Law):**  The Former Advisors' conduct amounts to "misappropriation" of the VALIC Companies' "books, files, and records," and "the confidential information contained therein," "especially the data pertaining to" clients, which constitute "trade secrets" under Virginia law, and the Former Advisors' "actions have caused and are threatening to cause irreparable harm and loss to the VALIC Companies and could cause the VALIC Companies

substantial loss of market share and goodwill so as to warrant injunctive relief under Virginia Code § 59.1-337;"[14] and,

**Count III:**     **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq.*: The Former Advisors' conduct amounts to "misappropriation" of the VALIC Companies' "books, files, and records," and "the confidential information contained therein," "especially the data pertaining to" clients, which constitute "trade secrets" under the Defend Trade Secrets Act, and the Former Advisors' "actions have caused and are threatening to cause irreparable harm and loss to VALIC and could cause VALIC substantial loss of market share and goodwill so as to warrant injunctive relief."[15]

(Compl. ¶¶ 73, 75–76, 78, 81–82, 85, 88, 90–91.)  For Count II, the VALIC Companies seek

$350,000 in punitive damages.  (*Id.* ¶ 83.)

On April 12, 2021, the Former Advisors responded to the VALIC Companies' Motion.

(ECF No. 17.)  The VALIC Companies replied.  (ECF No. 18.)  The Parties appeared before the

Court on April 16, 2021 for a hearing on the Motion.  For the reasons articulated below, the

Court will grant in part the Motion.

## II.  Standard of Review

"Federal Rule of Civil Procedure 65 authorized federal courts to issue temporary

restraining orders and preliminary injunctions."  *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728

(E.D. Va. 2017).  "Both are 'extraordinary remedies involving the exercise of [a] very far-

reaching power to be granted only sparingly and in limited circumstances.'"  *Id.* (quoting

*MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001)).

---

[14] Virginia Code § 59.1-337 provides injunctive relief as a remedy for violations of the VUTSA and states, in pertinent part that "[a]ctual or threatened misappropriation may be enjoined."  Va. Code § 59.1-337(A).

[15] The DTSA provides injunctive relief as a remedy in civil actions.  18 U.S.C. § 1836(b)(3)(A) ("In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may . . . grant an injunction . . . .").

"The standard for granting either a TRO or a preliminary injunction is the same." *Id.*
(citation omitted). A party seeking either form of injunctive relief "must establish [1] that he [or
she] is likely to succeed on the merits, [2] that he [or she] is likely to suffer irreparable harm in
the absence of preliminary relief, [3] that the balance of equities tips in his [or her] favor, and
[4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,
20 (2008). Courts in the Fourth Circuit require that each of these factors be "satisfied as
articulated." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citation omitted).
"Accordingly, courts considering whether to impose [either a TRO or a preliminary injunction]
must separately consider each *Winter* factor." *Id.* at 321.

## III. Analysis

For the reasons articulated below, the Court will grant in part the Motion. The Court
begins by finding that this matter is properly before it based on the plain language of the FPAs,
the Financial Industry Regulatory Authority's Code of Arbitration Procedures ("FINRA
Procedures"), and the AIG Dispute Resolution Program (the "EDRP"). After making that
finding, the Court turns to the *Winter* factors, concluding that: (1) the VALIC Companies make
a clear showing of likelihood of success on the merits as to Counts I, II, and III; (2) the VALIC
Companies are likely to suffer irreparable harm absent preliminary relief; (3) the balance of the
equities tips in favor of granting a preliminary injunction; and, (4) an injunction is in the public
interest. Because VALIC Companies satisfy all four *Winter* factors, the Court concludes that the
VALIC Companies are entitled to some form of preliminary injunctive relief. The VALIC
Companies, however, request terms of the preliminary injunction that are more burdensome to
the Former Advisors than necessary to provide complete relief to the VALIC Companies. The

Court therefore concludes its analysis by narrowly tailoring the scope of the preliminary injunction.

**A.    This Matter Is Properly Before the Court Based on the Plain Language of the FPAs, FINRA Procedures, and the EDRP**

The plain language of the FPAs, FINRA Procedures, and the EDRP render this matter properly before the Court. At the April 16, 2021 hearing, the Parties agreed that the merits of this case will be resolved in arbitration. Under the FPAs, all "[d]isputes arising from or under" the agreement "between Financial Professional and VFA shall be resolved in accordance with [FINRA Procedures]; any provision to the contrary within the [EDRP] or otherwise providing for a different forum shall be of no effect." (FPAs § VII.A.) The FPAs also provide, in pertinent part, that all "[d]isputes arising from or under" the agreement "between Financial Professional and any non-FINRA member, including VALIC, shall be resolved in accordance with the terms of the EDRP." (*Id.*) What these provisions mean in this case is that: (1) "VFA's claims against all [the Former Advisors] must be resolved in FINRA arbitration;" and, (2) VALIC's claims "against Coreth and Rawls[16] must be resolved in AAA arbitration pursuant to [the EDRP]." (Mem. Supp. Mot. 3 n.1.)

The Parties dispute whether this matter is properly before the Court because of certain provisions in the EDRP and their interaction with FINRA Procedure Rule 13804. At the hearing, the Parties entered a copy of the applicable EDRP into the record. Two provisions of the EDRP pertain. First, under the section of the EDRP entitled "Mediation Procedures and Arbitration Rules," Rule 2 provides that:

> [t]he parties must have mediated their Dispute prior to the filing an application for arbitration. A party may initiate proceedings by arbitration under the Rules by filing a written request for arbitration with AAA.

---

[16] Robertson is not subject to the EDRP.

(EDRP 6.[17]) Second, under a section of the EDRP entitled "Program Description," the

"Application and Coverage" provision states, in pertinent part, that:

> [n]otwithstanding any other provision of the Description or Rules, a Party may apply to a court with jurisdiction over the Parties for temporary, preliminary, or emergency injunctive relief that, under the legal and equitable standards applicable to the granting of such relief, is necessary to preserve the rights of that Party pending the arbitrator's modification of any such injunction or determination of the merits of the dispute.

(*Id.* 3.) Finally, under FINRA Procedure Rule 13804,

> [a] party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration under the Code must, at the same time, file with the Director a statement of claim requesting permanent injunctive and all other relief with respect to the same dispute through the Party Portal.

Code Arb. Proc. Indus. Disps. § 13804(a).

At the hearing, the Former Advisors argued that reading the EDRP and FINRA Procedure

Rule 13804 in conjunction with the FPAs leads to the conclusion that this matter is not properly

before the Court. According to the Former Advisors, Rule 2 of the EDRP requires mediation

before the filing of an application for arbitration. There is no question that the Parties have not

mediated. As a result, the Former Advisors suggest that the VALIC Companies could not have

properly filed an application for arbitration pursuant to FINRA Procedure Rule 13804, meaning

that the VALIC Companies cannot seek preliminary relief from a court. Further, although the

Application and Coverage provision of the EDRP permits the Parties to apply for temporary,

preliminary, or emergency injunctive relief in a court with jurisdiction, the Former Advisors

assert that that provision of the EDRP cannot apply because if it did it would conflict with

---

[17] During the April 16, 2021 hearing, the Court accepted into evidence the EDRP. (*See* ECF No. 19.)

FINRA Procedure Rule 13804, and under the FPAs, any provision of the EDRP "to the contrary" of FINRA Procedures "shall be of no effect." (FPAs § VII.A.)

This reading of the EDRP, FINRA Procedure Rule 13804, and the FPAs does not persuade. The Court clarifies: (1) FINRA Procedures only apply to VFA because VALIC is a non-FINRA entity; (2) the EDRP governs VALIC's claims; and, (3) the only parties to the FPAs are the Former Advisors and VFA, not VALIC. Thus, neither the FPAs nor FINRA Procedure Rule 13804 applies to VALIC. Instead, the procedural propriety of VALIC seeking preliminary relief in this Court turns entirely on the EDRP. Under Rule 2 of the EDRP, VALIC must seek mediation before applying for arbitration, but Rule 2 is of no moment because the Access and Coverage provision of the EDRP explicitly states that "[n]otwithstanding any provision . . . of the Rules," including Rule 2, "a Party may apply to a court with jurisdiction over the Parties for temporary, preliminary, or emergency injunctive relief." (EDRP 3.) Because jurisdiction properly lies with this Court, VALIC may apply for temporary, preliminary, or emergency injunctive relief here under the plain terms of the EDRP. Accordingly, this matter as it relates to VALIC is properly before the Court.

The same conclusion obtains with respect to VFA, although for different reasons. Under the FPAs, all of VFA's claims must be "resolved in accordance with" FINRA Procedures and "any provision to the contrary within the [EDRP] . . . shall be of no effect." (FPAs § VII.A.) VFA's claims, in other words, are only properly before this Court if in accordance with FINRA Procedures, including Rule 13804. That rule is clear: to seek "a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to

arbitration," a party "must, at the same time," file a statement of claim with FINRA.[18]  Code Arb.

Proc. Indus. Disps. § 13804(a).  No party disputes that VFA filed a statement of claim with

FINRA.  Thus, under FINRA Procedures, VFA may properly seek preliminary relief in this case.

That VFA did not mediate before applying for arbitration, in violation of Rule 2 of the EDRP,

"shall be of no effect" to the extent it conflicts with FINRA Procedures, which it does.

Accordingly, this matter as it relates to VFA is also properly before the Court.

### B.      The VALIC Companies Are Likely to Succeed on the Merits of Counts I, II, and III

Finding the present matter properly before it, the Court turns to the *Winter* factors and

starts with the first factor:  likelihood of success on the merits.  The Court finds that the VALIC

Companies make a clear showing of likely success on the merits as to Counts I, II, and III.

For Count I, the breach of contract claim, the VALIC Companies contend that the Former

Advisors have violated three provisions of the FPAs:  (1) the Misappropriation Provision; (2) the

Nonsolicitation of Customers Provision; and, (3) the Nonsolicitation of Employees Provision.[19]

(*See* Mem. Supp. Mot. 15.)  In response, the Former Advisors argue that the VALIC Companies

have not made a clear showing that the Former Advisors "breached any confidentiality

---

[18] At the April 16, 2021 hearing, Counsel for the VALIC Companies noted that the VALIC Companies filed a statement of claim with FINRA twelve hours after filing the present Motion.  Because Counsel for the Former Advisors did not contest the timeliness of the VALIC Companies' filing with FINRA, the Court finds that argument of no moment.

[19] Although the VALIC Companies assert that the Former Advisors "have . . . [i]nduced or solicited other VALIC Companies' financial professionals," (Mem. Supp. Mot. 15), they do not brief this argument, (*cf. id.*).  Without any analysis, the VALIC Companies have not made a "clear showing" of likely success on the merits for this alleged violation of the FPAs.  *See Pashby*, 709 F.3d at 321.  Despite this, the VALIC Companies are still likely to succeed on the merits of Count I because they make a clear showing that the Former Advisors breached their duties under both the Misappropriation and Nonsolicitation of Customers Provisions of the FPAs.

obligations to the VALIC Companies."[20] (Resp. 12.) As to the alleged violations of the nonsolicitation covenants, the Former Advisors assert those "covenants . . . are unenforceable" under Texas law. (*Id.* 22.) Unpersuaded by the Former Advisors' arguments, the Court concludes that the VALIC Companies demonstrate a likelihood of success as to Count I. The VALIC Companies make a clear showing that the Financial Advisors breached their duties under both the Misappropriation Provision and Nonsolicitation of Customers Provision of the FPAs, and that the VALIC Companies sustained damages as a result of these breaches.

As for Count II, the violation of the VUTSA claim, the VALIC Companies maintain a likelihood of success on the merits based on the Former Advisors' "use of [the VALIC Companies'] trade secrets to solicit Protected Customers in an effort to induce them to move their business away from the VALIC Companies." (Mem. Supp. Mot. 20.) The Former Advisors present no analysis under the VUTSA, alleging that this claim lacks an evidentiary basis. (Resp. 10, 26.) The Court finds that VALIC Companies are likely to succeed on the merits of Count II because, without the VALIC Companies' consent, the Former Advisors acquired and used client information, which constitutes a trade secret on these facts.

---

[20] In their response brief, the Former Advisors do not directly address the VALIC Companies' claims based on misappropriation. (*Cf.* Resp.) Generally, the Court need not consider arguments not raised in the motion at issue. *Cf. Mew Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665, 671 (N.D. W. Va. 2014), *aff'd*, 594 F. App'x 143 (4th Cir. 2015).

To be sure, they do argue that the VALIC Companies' claim that they "have misappropriated and misused confidential information" is baseless. (*Id.* 10.) But the Former Advisors present no analysis to controvert the VALIC Companies' claims that: (1) the Former Advisors breached the FPAs by violating the Misappropriation Provision; (2) the Former Advisors violated the VUTSA; or, (3) the Former Advisors violated the DTSA. The Court does not consider such omissions as concessions, but the Former Advisors' failure to contest these claims is revealing.

And as for Count III, the violation of the federal DTSA claim, the VALIC Companies assert that they are likely to succeed on the merits because "substantial evidence" shows that each Former Advisor wrongfully acquired, used, and disclosed client information, among other trade secrets, under circumstances in which they knew that such information was to be kept confidential. (Mem. Supp. Mot. 21.)  As was true with the VUTSA claim, the Former advisors present no analysis under the DTSA and instead attack the evidentiary basis of the DTSA claim. (Resp. 10, 26.)  Because the Former Advisors acquired and used client information without authorization and while under a duty to maintain that information's confidentiality, the Court finds that the VALIC Companies are likely to succeed on the merits of Count III.

### 1.    Legal Standard

A party seeking a TRO or preliminary injunction must "make a 'clear showing' that they are likely to succeed at trial." *Pashby*, 709 F.3d at 321 (citation omitted.)  Certainty of success is not required. *Id.*  "Where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief." *Lessard*, 2012 WL 859459, at *5.

### 2.    The VALIC Companies Are Likely to Succeed on the Merits of the Breach of Contract Claim (Count I) Because They Make a Clear Showing the Former Advisors Violated Both the Misappropriation and the Nonsolicitation of Customers Provisions of the FPAs

Finding the FPAs governed by Texas law,[21] the Court concludes that the VALIC Companies are likely to succeed on the merits of Count I because they make a clear showing that

---

[21] Because the FPAs contain a valid choice-of-law provision, Texas law applies to the VALIC Companies' breach of contract claim.  "Federal courts exercising diversity jurisdiction," as the Court is here, "must apply the choice-of-law rules of the state in which the court is sitting." *JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, No. 3:15cv235, 2017 WL 4003026, at *8 (E.D. Va. Sept. 11, 2017) (Lauck, J.) (citation omitted).  The FPAs provide that Texas law governs.  (FPAs § VIII.C.)  "[N]either party challenges the fairness or reasonableness of the choice-of-law provision, or claims that the choice-of-law provision was affected by fraud

the Former Advisors breached both the Misappropriation and Nonsolicitation of Customers Provisions of the FPAs.

### b. Legal Standard: Texas Breach of Contract Law

"In Texas, '[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted). "A breach occurs when a party fails to perform a duty required by the contract." *Id.* "Further, in order to properly plead a claim based on breach of the contract, Plaintiff must point to a specific provision in the contract that was breached by Defendants." *Morse v. Commonwealth Land Title Ins. Co.*, No. 4:12cv375, 2013 WL 5372395, at * 11 (E.D. Tex. Sept. 13, 2015).

### c. Violation of Misappropriation Provision

The VALIC Companies present clear evidence of a breach of the Misappropriation Provision, as is required to succeed on the merits of Count I, because the Former Advisors acquired client information without authorization and used that information to contact clients after resigning from VFA. Under the Misappropriation Provision, the Former Advisors agreed to:

> a. maintain the confidentiality of the Protected Companies' Nonpublic Personal Information, Property, Trade Secret, and Confidential and Proprietary Information; and
>
> b. not disclose, transfer, or otherwise Misappropriate such information in any way, including to or for the benefit of unaffiliated third parties.

---

or unequal bargaining power." *JAAAT Tech. Servs.*, 2017 WL 4003026, at *8. Thus, Texas law applies to the breach of contract claim.

(FPAs § V.C.3.) The Misappropriation Provision, in pertinent part, imposed a duty on the

Financial Advisors not to acquire, use, or disclose customer names, contact information, and

account balances for any purpose other than in furtherance of their duties undertaken on behalf

of VALIC and VFA.

In addition, the Misappropriation Provision specifically provides:

> It shall be deemed a violation of this Agreement for Financial Professional to . . .
> copy . . . , by any means, format, or device, the Property of the Protected
> Companies in any manner whatsoever . . . , except in the performance of Financial
> Professional's authorized duties.

(*Id.* § V.C.3.) "Property shall include anything and everything Financial Professional acquires

by virtue of Financial Professional's employment or other relationship with a Protected

Company, except compensation due to Financial Professional from Financial Professional's

employer." (*Id.* § IX.M.)

The Former Advisors contend that "[t]he VALIC Companies' claim that the [Former

Advisors] have misappropriated or misused confidential information is based on unsupported

speculation." (Resp. 10.) The Former Advisors maintain that they "have not breached any

confidentiality obligations to the VALIC Companies, and the VALIC Companies' allegations to

the contrary are based solely on hearsay, couched in conclusory terms, pure speculation, and

erroneous assertion of fact." (*Id.* 12.)

Despite the Former Advisors' protestations to the contrary, the VALIC Companies'

allegation that they breached the Misappropriation Provision are not based solely on hearsay and

unsupported speculation. In their declarations, Robertson, Coreth, and Rawls each admit to

having "jotted down the names, addresses, telephone number and/or email addresses and, in

some instances, . . . approximate account values, of clients." (Decl. Robertson ¶ 8; Decl. Coreth

¶ 8; Decl. Rawls ¶ 8.) They each further admit that they "have this handwritten list in [their]

23

possession." (*Id.*)  In the next paragraph, they then each admit to having "contacted those clients" after they left VFA.  (*Id.* ¶ 9.)

These admissions are fatal to their defense.  Under the Misappropriation Provision, each Former Advisor had a duty not to acquire, use, or disclose customer names, contact information, and account balances for any purpose other than in furtherance of their duties undertaken on behalf of VALIC and VFA.  (*See* FPAs § V.C.3.)  The Former advisors breached this duty when they, without the VALIC Company's authorization or awareness, (*see* Reply 10), "jotted down" customer names, contact information, and account values before resigning from VFA.  They breached it again when they contacted their former clients after leaving VFA.[22]  *See Smith Int'l*, 490 F.3d at 387.  Accordingly, the Former Advisors are likely to succeed on the merits of their claim that the Former Advisors breached the Misappropriation Provision of their respective FPAs.

### d.    Violation of Nonsolicitation of Customers Provision

First finding the Nonsolicitation of Customers Provision enforceable, the Court ultimately concludes that the Former Advisors violated this provision by inducing clients to end or alter their relationship with the VALIC Companies.  This violation constitutes an independent breach of the FPAs, rendering the VALIC Companies' likelihood of success on the merits of Count I even stronger.

---

[22] To the extent the Former Advisors suggest that they misappropriated the VALIC Companies' client information to further the interests of their clients, the Court finds this argument unpersuasive.  (*See* Decl. Robertson ¶¶ 5–6; Decl. Coreth ¶¶ 5–6; Rawls ¶¶ 5–6.)  The FPAs govern the duties the Former Advisors owed to the VALIC Companies, not their clients. The Former Advisors could have avoided any conflict between their contractual duties to the VALIC Companies and their fiduciary duties to their clients by informing VFA of their departure before tendering their resignations.  Even presuming they did not use any other exported information, these notes violate the FPAs.

The Nonsolicitation of Customers Provision states, in pertinent part:

> [D]uring the term of this Agreement and for a period of one (1) year after its termination, Financial Professional agrees not to Solicit or Induce, or attempt to Solicit or Induce, directly or indirectly, for the benefit of Financial Professional or any other person or entity, any Protected Customer to end or alter Protected Customer's relationship with any Protected Customer.

(FPAs § V.F.1.a.)

The VALIC Companies allege that the Former Advisors violated their duties under the Nonsolicitation of Customers Provision. (*See* Mem. Supp. Mot. 21.) The Former Advisors counter by arguing that "the definitions of 'Protected Customer' and 'Territory' are ambiguous and overbroad, rendering the [Nonsolicitation of Customers Provision] unenforceable." (Resp. 23.) The FPAs define "Protected Customer" as:

> [A]ny person who is or was a customer of any Protected Company who was within Financial Professional's assigned Territory or, with respect to a customer outside the Territory, for which the Financial Professional was assigned, and who, within the one-year period immediately preceding the termination of this Agreement, was either assigned to Financial Professional or with whom Financial Professional communicated regarding Protected Companies' products or services . . . .

(FPAs § IX.P.) "Territory" refers to "any geographical description, or any customer, group, or service assignment, or any combination thereof." (*Id.* § IX.V.) Even if these provisions are not ambiguous or overbroad, the Former Advisors still maintain that the Nonsolicitation of Customers Provision is "unenforceable because it purports to restrict [them] from soliciting the clients they cultivated prior to working with the VALIC Companies, and before they had access to the confidential and proprietary information of VALIC." (Resp. 25.)

The Court finds the Nonsolicitation of Customers Provision enforceable and concludes that the Former Advisors violated it by inducing clients to end or alter their relationship with the VALIC Companies.

i.    **Legal Standard:  Enforceability of Nonsolicitation Agreements Under Texas Law**

In Texas, "[e]nforceability of a non-solicitation agreement is governed by the Covenants Not to Compete Act, Texas Business and Commerce Code § 15.50.10." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 328 (5th Cir. 2018) (citing Tex. Bus. & Com. Code § 15.50(a)).  Under this Act,

> a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise.

Tex. Bus. & Com. Code § 15.50(a).  "[N]otwithstanding the text of § 15.50(a), a non-solicitation agreement may be enforceable under Texas law even if it does not expressly contain geographical limitations." *GE Betz*, 885 F.3d at 329 (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006)).  This is so because the "core inquiry" under § 15.50(a) is whether the nonsolicitation agreement's restrictions "are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of the promisee." *Johnson*, 209 S.W.3d at 655, 656–57 (enforcing a restrictive covenant without any geographic restriction and that restricted the employee from contacting clients "of whom he was aware before signing the employment agreement").

ii.    **Because the Nonsolicitation of Customers Provision Is Reasonable, the Provision Is Enforceable**

Finding the Nonsolicitation of Customers Provision reasonable, the Court concludes that it is also enforceable.  The provision is ancillary to an otherwise enforceable agreement in which the VALIC Companies agreed to grant the Former Advisors access to their confidential and proprietary information and the use of their property in exchange for the Former Advisors

26

promise not to misappropriate or disclose that information or property. (*See* FPAs § III.) The one-year time restriction in the Nonsolicitation of Customers Provision is reasonable, "as 'Texas courts have generally upheld non-compete restrictions ranging from two to five years.'" *Le-Vel Brands, LLC v. Bland*, No. 3:19cv00154, 2019 WL 4753041, at *7 (N.D. Tex. Sept. 30, 2019) (quoting *Brink's Inc. v. Patrick*, No. 3:14cv775, 2014 WL 2931824, at *5 (N.D. Tex. June 27, 2014)).

The Former Advisors' argument that the definition of "Protected Customer" is ambiguous or overbroad seeks to undermine the reasonableness of the scope of the Nonsolicitation of Customers Provision. However, the Court sees no such ambiguity or overbreadth. The plain language of this definition is clear. It states that a "Protected Customer" is any person or institution: (1) "who is or was a customer of any Protected Company;" (2) "who was within the Financial Professional's assigned Territory or, with respect to a customer outside the Territory, for which the Financial Professional was assigned;" and, (3) "who, within the one-year period immediately preceding the termination of this Agreement, was either assigned to Financial Professional or with whom Financial Professional communicated regarding Protected Companies' products or services." (FPAs § IX.P.) The Court sees no ambiguity in these restrictive clauses. Clause (1) refers only to customers of the Protected Company, a term clearly defined in the FPAs.[23] Clause (2) refers only to customers either within the advisor's assigned territory or to whom the advisor was assigned. And clause (3) refers only to customers who, during the year preceding the advisor's termination, were either assigned to the advisor or communicated with the advisor about the Protected Companies' products or services. Because

_____

[23] The FPAs define "Protected Company" to include "[VALIC], [VFA], VALIC Retirement Services Company, an AIG Company, and any of their subsidiary companies or successors." (FPAs § IX.P.)

27

each of these clauses has a single referent, no ambiguity exists in the Nonsolicitation of Customers Provision. *See Builders Mut. Ins. Co. v. Parallel Design & Dev. LLC*, 785 F. Supp. 2d 535, 543 (E.D. Va. 2011) ("[L]anguage is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time" (internal quotation marks and citation omitted).)

These three restrictive clauses also narrowly tailor the scope of the Nonsolicitation of Customers Provision. Because of these clauses, the Nonsolicitation of Customers Provision only applies to customers with whom the advisor recently interacted (either by assignment or by communication), *and* who reside in the same geography as the advisor or who were formerly clients of the advisor. (*Id.*) The Court finds this scope reasonably tailored "to protect the goodwill or other business interest" of the VALIC Companies. Tex. Bus. & Com. Code § 15.50(a).

Finally, the Former Advisors argue that the Nonsolicitation of Customers Provision is "unenforceable because it purports to restrict [them] from soliciting the clients they cultivated prior to working with the VALIC Companies, and before they had access to the confidential and proprietary information of VALIC." (Resp. 25.) None of the Former Advisors, however, brought any clients with them to the VALIC Companies. Rawls and Coreth never say that they brought any clients with them. (*Cf.* Decl. Rawls; Decl. Coreth.) Robertson suggested that he may have, declaring he has client relationships spanning "25–35 years." (Decl. Robertson ¶ 8.) But Robertson "began working at VFA" thirty-four years ago "in 1987," (*id.* ¶ 3), and before then he did not hold a license to work in the financial-services industry, nor was he registered as a representative with any financial-services firm, (Compl. Ex. 5 "Robertson IAPD Report" 18, 20, ECF No. 6-5). Robertson's contention does not counter the clear showing otherwise

28

presented by the VALIC Companies.  The Court therefore rejects the Former Advisors' final argument for declaring the Nonsolicitation of Customers Provision unenforceable, which is reasonable under Texas law.  *See Johnson*, 209 S.W.3d at 656–57.

> ### iii.  The Former Advisors Violated the Nonsolicitation of Customers Provision by Inducing Clients to Alter or End Their Relationship with the VALIC Companies

Having found the Nonsolicitation of Customers Provision reasonable and enforceable under Texas law, the Court next considers whether the VALIC Companies are likely to succeed on the merits of their claim that the Former Advisors violated this provision.  As the Court referenced above, the VALIC Companies assert that each Former Advisor "solicited [the VALIC Companies'] clients after their resignation."  (Mem. Supp. Mot. 11.)  According to the VALIC Companies, Rawls and Coreth have contacted "at least" eight and eleven clients respectively since they resigned.  (*Id.*; Decl. Cosby ¶¶ 15–16.)  About Rawls specifically, the VALIC Companies aver that one of its institutional clients, "whose employees invest in VALIC products," "informed VALIC that Rawls was attempting to solicit its personnel to move their accounts away from the VALIC Companies," and that "[a]nother client reported to a VALIC Companies' employee that Rawls was contacting him several times a week, although the client stated that he is not leaving VALIC."  (Mem. Supp. Mot. 11–12; Decl. Cosby ¶ 19.)  Rawls is also allegedly contacting clients on Robertson's behalf.  (Mem. Supp. Mot. 12; Decl. Cosby ¶ 18.)

In response, the Former Advisors posit that "[c]ontacting clients to inform them of a substantial change to their account relationships and to respond to questions does not constitute 'solicitation.'"  (Resp. 13 (citation omitted).)  And although they do not deny the VALIC Companies' allegations about client complaints, the Former Advisors submit that these

allegations "are not supported by credible evidence," as they "rely on hearsay, lack critical details, and omit material facts." (*Id.* 16 (citation omitted).)

Despite these contentions, the VALIC Companies "make a 'clear showing' that they are likely to succeed at trial" at establishing the Former Advisors' breach of the Nonsolicitation of Customers Provision. *Pashby*, 709 F.3d at 321 (citation omitted). Robertson, Coreth, and Rawls each admit that they contacted clients after they left VFA. (Decl. Robertson ¶ 9; Decl. Coreth ¶ 9; Decl. Rawls ¶ 9.) Although contacting clients does necessarily constitute solicitation, the Court finds that on these facts it likely does. In a declaration, Elise Cosby, the District Vice President of VFA's Richmond, Virginia office, attested that "[a]s of March 25, 2021, at least 71 clients have transferred their assets to CG Advisory Services." (Decl. Cosby ¶ 26.) The Former Advisory do not contest this statement. (*cf.* Resp.)

A violation of the Nonsolicitation of Customers Provision by reason of "Inducement" turns on the effect, rather than the intent or nature, of the advisor's actions. (*See* FPAs § IX.G.) The FPAs define "Inducement" to mean, among other things, "to affect," "to sway," "to bring about," "to cause," "to prompt," "to provoke," or "to trigger." (*Id.*) Thus, for purposes of the Nonsolicitation of Customers Provision, Inducement occurs when the advisor's actions "directly or indirectly" result in a Protected Customer "end[ing] or alter[ing]" his, her, or its relationship with the VALIC Companies "for the benefit" of the advisor. (*See id.* §§ V.F.1.a and IX.G.)

Here, the Former Advisors' contact with the clients they served at VALIC constitutes Inducement, in violation of the Nonsolicitation of Customers Provision, because that contact preceded at least seventy-one clients transferring their accounts to CG Advisory Services, which ended or altered their relationships with the VALIC Companies and benefitted the Former

30

Advisors. Although some of these seventy-one clients may be friends of the Former Advisors[24] and so may have transferred their accounts regardless of the Former Advisors' contact, the Court finds it improbable that all seventy-one clients would have ended or altered their relationships with the VALIC Companies absent the Former Advisors' contact. The Court therefore concludes that the VALIC Companies are likely to succeed on the merits of their claim that the Former Advisors breached the Nonsolicitation of Customers Provision. *See Smith Int'l*, 490 F.3d at 387.

### d. The VALIC Companies Are Likely to Show Damages for the Former Advisors' Breaches of the FPAs

The Court also concludes that the VALIC Companies are likely to succeed on the merits in showing that they sustained damages as a result of the Former Advisors' breaches of both the Misappropriation and the Nonsolicitation of Customer Provisions—the final element of a breach of contract claim in Texas. *Smith Int'l*, 490 F.3d at 387. The VALIC Companies have presented uncontroverted evidence that "at least 71 clients have transferred their assets to CG Advisory Services" since the Former Advisors have resigned. (Decl. Cosby ¶ 26.) It is almost certainly the case that some, if not all, of these clients effectuated the transfer because of their contact with the Former Advisors—contact made in breach of the Former Advisors' duties under the Misappropriation and the Nonsolicitation of Customer Provisions of the FPAs. (*See* FPAs §§ V.C.3 and F.1.a.)

_____

[24] In their declarations, each Former Advisor attests that he has "a personal or familial relationship" with "some" clients; none of them states how many. (Decl. Robertson ¶ 8; Decl. Coreth ¶ 8; Decl. Rawls ¶ 8.) At the April 16, 2021 hearing, however, counsel for the VALIC Companies clarified that they excluded family members from their total count of clients who have transferred accounts from the VALIC Companies to CG Advisory Services. Thus, the VALIC Companies have made a clear showing that none of the more than $45 million in assets transferred involved family members.

In sum, the VALIC Companies make a clear showing that: (1) a valid contract exists (the FPAs); (2) the VALIC Companies performed; (3) the Former Advisors breached duties under specific provisions of that contract (the Misappropriation and the Nonsolicitation of Customer Provisions); and, (4) the VALIC Companies sustained damages as a result of the Former Advisors' breaches. Accordingly, the Court concludes that the VALIC Companies are likely to succeed on the merits of Count I, *see Smith Int'l*, 490 F.3d at 387, in satisfaction of the first *Winter* factor, *see* 555 U.S. at 20.

### 3. The VALIC Companies Are Likely to Succeed on the Merits of the VUTSA Claim (Count II) Because, Without Consent, the Former Advisors Acquired and Used Client Information, a Trade Secret Under Virginia Law

The VALIC Companies are also likely to succeed on the merits of Count II, the misappropriation of trade secrets claim under the VUTSA. The VALIC Companies claim that the Former Advisors violated the VUTSA because the Former Advisors used the VALIC Companies' "trade secrets to solicit Protected Customers in an effort to induce them to move their business away from the VALIC Companies." (Mem. Supp. Mot. 19–20.) The VALIC Companies aver that "the information concerning [their] Protected Customers and other Confidential Information" misappropriated by the Former Advisors constitutes a trade secret under VUTSA because: (1) this information derives "independent economic value" by not being generally known outside of the VALIC Companies' business;" and, (2) the VALIC Companies "have made reasonable efforts to preserve the confidentiality and secrecy of this information." (*Id.* 19–20.) To obtain these trade secrets, the VALIC Companies maintain that the Former Advisors "breached their fiduciary duty to VALIC during their employment." (*Id.* 20 n.5.) The VALIC Companies also assert that once they resigned, the Former Advisors used their trade secrets to "solicit Protected Customers" to transfer their accounts to CG Advisory Services.

32

(*Id.* 20.) For these reasons, the VALIC Companies conclude that they "are likely to prevail on the merits" for their misappropriation of trade secrets claim, both under the VUTSA. (*Id.*)

The Former Advisors present no analysis under the VUTSA in response to the VALIC Companies' claim. Instead, they respond by generally questioning the evidentiary basis of the VALIC Companies' misappropriation claims. According to the Former Advisors, the VALIC Companies rely on declarations from Cosby, VFA's District Vice President in Richmond, and Troy Zuckero, VALIC's Director of Career Distribution Technology, "[i]n support of [the VALIC Companies'] assertions." (Resp. 10.)

The Former Advisors contest Cosby's assertion that clients have expressed "concern that [the Former Advisors] have their personal information," characterizing this statement as "pure speculation of what someone else thinks" and being made without attribution "to any identified client(s)." (*Id.* 11; *see also* Decl. Cosby ¶ 24.) The Former Advisors also attempt to discredit Cosby's declaration that "[o]ne client called and requested that her funds be transferred and stated that she already had received the rollover/transfer from her advisor," a claim which the Former Advisors submit lacks "specifics" and from which "it can be reasonably inferred . . . [involved] a call made to a call center." (Resp. 11; *see also* Decl. Cosby ¶ 25.)

As to the Zuckero declaration, the Former Advisors likewise urge that it is based on "hearsay," "pure speculation," and "erroneous assertions of fact." (Resp. 12.) They state that Zuckero, whose declaration focuses on the Former Advisors' use and exportation of information from the VALIC Companies' proprietary software databases, "does not, and cannot, assert that the [Former Advisors] downloaded or exported any information to a non-company device." (*Id.*; *see generally* Decl. Zuckero.) The Former Advisors also contextualize Zuckero's statements that the Former Advisors entered random keystrokes like "k" and "asfd" as their business reasons for

exporting client lists from AGILEnet.  (*See* Decl. Zuckero ¶¶ 35, 36.)  According to the Former

Advisors, "Zuckero fails to acknowledge that Robertson and Rawls have always simply entered

letters when performing the same actions," and that Laura Stocker, District Office Coordinator,

instructed Robertson and Rawls to "type a series of keystrokes" "when asked to provide a

business reasons for exporting client lists." (Resp. 12; Decl. Robertson ¶ 24; Decl. Rawls ¶ 25.)

Because of these evidentiary issues, the Former Advisors aver that "there are substantial

questions regarding the ability of the VALIC Companies to succeed on their claims." (Resp. 26.)

Before turning to the merits of the VUTSA claim, the Court must first determine what

law applies.  Finding that Virginia state law controls, the Court concludes that the VALIC

Companies make a clear showing of likelihood of success on the merits of Count II.

a.    **Virginia Law Applies to the State Misappropriation of Trade Secrets Claim**

Virginia law applies to the VALIC Companies' state misappropriation of trade secrets

claim because the alleged improper acquisition, use, and disclosure of the VALIC Companies'

trade secrets occurred in Virginia.

Misappropriation of trade secrets is a tort at common law.  *See MicroStrategy Inc. v. Bus.*

*Objects, S.A.*, 331 F. Supp. 2d 396, 415 (E.D. Va. 2004).  "Virginia applies the *lex loci delicti*,

the law of the place of the wrong, to tort actions." *Milton v. IIT Research Inst.*, 138 F.3d 519,

521 (4th Cir. 1998).  "[T]he place of the wrong is the place the last event necessary to make an

[actor] liable for an alleged tort takes place." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp.

2d 850, 856 (E.D. Va. 2013) (internal citations and quotations omitted).  In other words,

"Virginia's choice of law rule selects the law of the state . . . wherever the effects of that act are

felt." *Milton*, 138 F.3d at 522.

34

Here, the injuries of which the VALIC Companies complain stem from the Former Advisors' improper acquisition, use, and disclosure of the VALIC Companies' confidential information. These actions occurred in Virginia, so Virginia law applies. *Cf. X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 640 (E.D. Va. 2001) (concluding Illinois and North Carolina law, not Virginia law, applied to a misappropriation of trade secrets claim when the improper disclosure and misuse of confidential information occurred in Illinois and North Carolina).

### b.      Legal Standard:  Misappropriation of Trade Secrets Under the VUTSA

The VUTSA codifies the tort of misappropriation of trade secrets. *MicroStrategy*, 331 F. Supp. 2d at 415; Va. Code § 59.1-336. To establish a misappropriation of trade secrets claim under the VUTSA, "a plaintiff must prove two statutory elements: (1) the existence of a 'trade secret'; and (2) the 'misappropriation' of that trade secret by the defendant." *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd,* 505 F. App'x 242 (4th Cir. 2013) (citation omitted); *accord Infinity Tech.*, 2020 WL 6387378, at *5.

The VUTSA defines a "trade secret" as information that: (1) "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and, (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code § 59.1-336. "[N]early any type of information can be subject to trade secret protections under [the VUTSA], so long as the information (i) has independent economic value by virtue of its being secret and (ii) is subject to reasonable efforts to maintain that secrecy." *OROS*, 2019 WL 2361047, at *3 (citing *MicroStrategy*, 331 F. Supp. 2d at 416). That includes

"customer lists" and "customer information." *Fid. Glob. Brokerage Grp., Inc. v. Gray*, No. 1:10cv1255, 2010 WL 4646039, at *1 (E.D. Va. Nov. 9, 2010).

As to "misappropriation," "the plaintiff must establish two elements:  (1) that the defendant acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) that the defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff." *Trident*, 859 F. Supp. 2d at 780; *accord Infinity Tech.*, 2020 WL 6387378, at *5. "'Where the defendant did not utilize 'improper means to acquire a trade secret,' misappropriation can still exist if the defendant disclosed or used that secret." *API Tech. Servs., LLC v. Francis*, No. 4:13cv142, 2013 WL 12131381, at *2 (E.D. Va. Dec. 4, 2013) (quoting *MicroStrategy*, 331 F. Supp. 2d at 417).  Misappropriation does not require outright theft; it can occur when an employee formerly entrusted with trade secret information uses or discloses that information after "the agency or fiduciary relationship between him [or her] and [the employer] ha[s] ended." *OROS*, 2019 WL 2361047, at *5.

### c.    The VALIC Companies Are Likely to Succeed on the Merits of a Misappropriation of Trade Secrets Claim Under the VUTSA

The VALIC Companies are likely to succeed on the merits of their VUTSA claim because, without the VALIC Companies' consent, the Former Advisors acquired and used client information, which constitutes a trade secret on these facts.

In their papers, the Parties do not dispute whether the VALIC Companies client information constitutes a trade secret under the VUTSA,[25] and the Court finds that the VALIC

---

[25] In their response brief, the Former Advisors did not address whether client information qualifies as a trade secret under the VUTSA.  (*Cf.* Resp.)  During the April 16, 2021 hearing,

Companies' "customer information[] easily qualifies" as such. *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *2. The VALIC Companies show that their client information has independent economic value by virtue of its being secret. *See OROS*, 2019 WL 2361047, at *3. The secrecy of the VALIC Companies' client information is also vital to their ongoing success because a "competitor armed with . . . information, such as maturity dates, account balances, and the like, can target the VALIC Companies' most valuable and valued clients." (Compl. ¶ 21.) "The information is therefore of value to whoever possesses it." *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *2

The VALIC Companies also present that they deploy reasonable efforts to maintain the secrecy of their client information. *See OROS*, 2019 WL 2361047, at *3. They "apparently go[] to lengths to ensure preservation of [this information's] secrecy," *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *2, as the VALIC Companies protect their client information through several layers of user IDs and passwords, limit its availability to a need-to-know basis, and restrict its access by requiring all financial advisors to execute confidentiality agreements. (*See* Mem. Supp. Mot. 18; Decl. Meinbresse ¶ 21; Decl. Zuckero ¶¶ 7, 19.)

Because the VALIC Companies' client information "(i) has independent economic value by virtue of its being secret and (ii) is subject to reasonable efforts to maintain that secrecy," it constitutes a trade secret under state and federal law. *OROS*, 2019 WL 2361047, at *3; *MicroStrategy*, 331 F. Supp. 2d at 416.

---

counsel for the Former Advisors cited the following sentence in their brief as supporting their argument that client lists are not trade secrets: "The VALIC Companies have not shown that the Richmond Advisors have improperly 'solicited' their clients or misused the VALIC Companies' confidential information." (*Id.* 9.) Even considering that argument, the Court does not find that the VALIC Companies' client information should lack protection as a trade secret.

The Court also finds that the VALIC Companies have established that the Former Advisors have misappropriated their trade secrets. Clear evidence exists that the Former Advisors acquired the VALIC Companies' trade secrets without authorization. Robertson, Coreth, and Rawls admit as much, declaring that they "jotted down the names, addresses, telephone number" and other information shortly before they resigned and without the VALIC Companies' awareness or consent. (Reply 10; Decl. Robertson ¶ 8; Decl. Coreth ¶ 8; Decl. Rawls ¶ 8.). Substantial evidence also exists that the Former Advisors used this information. Again, Robertson, Coreth, and Rawls admit as much, stating that they possess a "handwritten list" of the VALIC Companies' client information and that they have "contacted" their former clients since resigning from VFA. (Decl. Robertson ¶¶ 8–9; Decl. Coreth ¶¶ 8–9; Decl. Rawls ¶¶ 8–9.) And because the Former Advisors acknowledged their confidentiality obligations when they signed their respective FPAs, (*see* FPAs § V.C.3), they "knew or had reason to know" that they acquired the client information "jotted down" on their handwritten lists while under "a duty to maintain [that information's] secrecy." *Trident*, 859 F. Supp. 2d at 780; *accord Infinity Tech.*, 2020 WL 6387378, at *5.

Accordingly, the Court finds clear evidence that the Former Advisors acquired and used trade secrets without consent. The VALIC Companies therefore are likely to succeed on the merits of Count II, the misappropriation of trade secrets claim under the VUTSA. *Trident*, 859 F. Supp. 2d at 780; *accord Infinity Tech.*, 2020 WL 6387378, at *5.

### 3.    For the Same Reasons As Their Likely Success on Merits of the VUTSA Claim, the VALIC Companies Are Likely to Succeed on the Merits of the DTSA Claim (Count III)

For substantially the same reasons, the Court concludes that the VALIC Companies are likely to succeed on the merits of Count III, the misappropriation of trade secrets claim under the

federal DTSA. The standards applicable under the VUTSA are "nearly identical" to those under the DTSA, so the Court's analysis under the VUTSA greatly informs its DTSA analysis. *See Infinity Tech., LLC v. Burney*, No. 1:19cv01507, 2020 WL 6387378, at \*5 (E.D. Va. June 4, 2020) (quoting *OROS, Inc. v. Dajani*, No. 1:19cv351 2019 WL 2361047, at \*3 (E.D. Va. June 4, 2019)).

"To demonstrate misappropriation of trade secrets [under the DTSA], [a plaintiff] must show . . . the existence of a protectable trade secret and misappropriation of that trade secret." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020). "'[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information,' regardless of whether it is tangible or intangible, or how the information is stored, memorialized, or maintained, can qualify for protection as a 'trade secret' under the federal Defend Trade Secrets Act." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (quoting 18 U.S.C. § 1839(3)). "However, such information only becomes a trade secret if (1) the owner of the trade secret takes 'reasonable measures to keep such information secret,' and (2) the information 'derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure [or] use of the information.'" *Id.* (quoting 18 U.S.C. § 1839(3)(A)–(B)).

As for misappropriation, the DTSA provides that occurs "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)." *Teeters*, 441 F. Supp. 3d at 132. "The DTSA further provides that the 'improper means' of acquiring a trade secret 'includes

39

theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" *Id.* (quoting 18 U.S.C. § 1839(6)(A)).

The VALIC Companies' client information qualifies as a trade secret under the DTSA. As discussed above, the VALIC Companies deploy "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). These various safeguards ensure that the VALIC Companies' client information is "not generally known . . . to another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). The VALIC Companies also "have spent years compiling" their "extensive client records and information" at "substantial expense," (Mem. Supp. Mot. 3), supporting the inference that the information is "not readily ascertainable through proper means." 18 U.S.C. § 1839(3)(B). And because a "competitor armed with . . . information, such as maturity dates, account balances, and the like, can target the VALIC Companies' most valuable and valued clients," (Compl. ¶ 21), "another person . . . can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). Accordingly, the VALIC Companies' are likely to succeed in establishing that their client information is a protectable trade secret under the DTSA. *See Teeters*, 441 F. Supp. 3d at 129.

The VALIC Companies' are also likely to succeed in establishing that the Former Advisors misappropriated these trade secrets. The Former Advisors "knew or had reason to know" that they acquired the client information "jotted down" on their handwritten lists while under "a duty to maintain [that information's] secrecy," *Teeters*, 441 F. Supp. 3d at 132, because they acknowledged this duty when they signed their respective FPAs, (*see* FPAs § V.C.3). The Former Advisors breached this duty by violating the Misappropriation Provision of the FPAs, as the Court found above. And because they breached their duty to maintain secrecy of the client

40

information, the Former Advisors acquired it through "improper means," constituting

misappropriation under the DTSA. *See Teeters*, 441 F. Supp. 3d at 132; 18 U.S.C. § 1839(6)(A).

Using this improperly acquired information to contact clients constituted an independent instance

of misappropriation under the DTSA as well. *See Teeters*, 441 F. Supp. 3d at 132; 18 U.S.C. §

1839(6)(A).

Because the information at issue qualifies for protection as a trade secret, and because the

Former Advisors' conduct amounts to at least two separate instances of misappropriation, the

Court concludes that the VALIC Companies are likely to succeed on the merits of Count III—

their misappropriation of trade secrets claim under the DTSA. *See MPAY*, 970 F.3d at 1016.

## C.   Irreparable Harm in the Absence of Preliminary Relief

Having determined the VALIC Companies are likely to succeed on the merits of Counts

I, II, and III, the Court now considers whether the VALIC Companies will suffer irreparable

harm in the absence of preliminary relief, the second *Winter* factor.

The VALIC Companies identify four types of irreparable harm that it will suffer if the

Former Advisors are not enjoined:  (1) "unauthorized disclosure and use" of confidential and

proprietary customer information; (2) "loss of confidentiality of clients' records and financial

dealings;" (3) loss of customers to CG Advisory Services; and, (4) "loss of confidence and trust

of clients, loss of goodwill, and loss of business reputation." (Mem. Supp. Mot. 25.)  The

Former Advisors contend that these harms "can be adequately compensated through monetary

damages." (Resp. 18.)[26]  And because the Former Advisors "have already 'solicited' [the

---

[26] The Former Advisors cite several cases within this district to support its contention that loss of customers and loss of goodwill do not constitute irreparable harm. *See Bank of Am. Inv. Servs., Inc. v. Byrd*, No. 2:09cv211, 2009 WL 10184606, at *1 (E.D. Va. June 15, 2009) (emphasizing that "a lost customer *may be* irreplaceable and the harm suffered from such loss *may be* irreparable"); *Wachovia Sec., LLC v. Gates*, No. 3:08cv226, 2008 WL 1803612, at *1

VALIC Companies'] clients," "it is even clearer . . . that the VALIC Companies can be fully compensated by a monetary award at judgment." (*Id.* 19 (internal quotation marks and citation omitted).)

"Generally, irreparable harm 'is suffered when monetary damages are difficult to ascertain or are inadequate.'" *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994)). "Irreparable harm must be 'neither remote nor speculative, but actual and imminent.'" *Id.* (quoting *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). "[T]he Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of

---

(E.D. Va. Apr. 21, 2008) (finding no irreparable harm in a departing-financial advisor case); *Prudential Sec., Inc. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998) (finding loss of customers "can be quantified, and [the former employer] can be substantially compensated with monetary damages for those losses").

The Court finds these cases distinguishable. These cases all reviewed motions for preliminary injunctive relief using the test from *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, which balanced various factors under a sliding-scale approach. 550 F.2d 189, 196 (4th Cir. 1977). As the Fourth Circuit recognized in *Real Truth About Obama, Inc. v. Federal Election Commission*, the *Blackwelder* test "stands in fatal tension with the Supreme Court's 2008 decision in *Winter*." 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated,* 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir.). Because the cases cited by the Former Advisors apply the pre-*Winter* test, the Court finds them legally distinguishable.

They are factually distinguishable as well. In some of these cases, the former employer presented almost no evidence, if any, of lost customers, lost goodwill, or damage to reputation. *See Byrd*, 2009 WL 10184606, at *7 (no customers lost); *Gates*, 2008 WL 1803612, at *3 (one customer lost). In the one case with clear evidence of lost customers, the former employer presented no evidence that the former advisor confiscated confidential client information before leaving; instead, the former advisor "merely used his memory to contact former customers." *Plunkett*, 8 F. Supp. 2d at 519. In this case, by contrast, the VALIC Companies credibly allege that they lost "at least 71 clients," and the Former Advisors admit that they "jotted down" confidential client information before resigning from VFA. (Decl. Cosby ¶ 26; Decl. Robertson ¶ 8; Decl. Coreth ¶ 8; Decl. Rawls ¶ 8.) *Byrd*, *Gates*, and *Plunkett* simply present different cases than the one at bar.

irreparable harm." *Id.* at 796 (quoting *Multi-Channel TV Cable Co.*, 22 F.3d at 552); *accord Bradley*, 756 F.2d at 1055 (4th Cir. 1985) (upholding preliminary injunction when plaintiff "faced irreparable, noncompensable harm in the loss of its customers"); *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at \*3 (finding irreparable harm includes "lost business, lost goodwill, and lost trust").

Here, the VALIC Companies face actual and imminent harm. Uncontroverted evidence shows that the VALIC Companies have lost at least seventy-one clients to CG Advisory Services since the Former Advisors resigned. (Decl. Cosby ¶ 26.) Additional, albeit contested, evidence shows that some clients have expressed concern to the VALIC Companies about the Former Advisors' repeated solicitations and clients' data privacy. (*See id.* ¶ 19.) This evinces lost goodwill, lost customer trust, and damage to reputation. The harm the VALIC Companies are suffering "is therefore actual," not "remote or speculative." *Samilow*, 311 F. Supp. 3d at 796 (lost customers); *accord Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at \*3 (lost goodwill and customer trust). The threat of future harm is also imminent. As the Former Advisors admit, they still possess handwritten copies of the VALIC Companies' trade secrets. And the VALIC Companies inform—and the Former Advisors do not contest—that since March 11, 2021, weeks after the Former Advisors received cease-and-desist letters, "at least 34 clients have transferred their accounts away from the VALIC Companies," twelve of whom "had not previously moved any accounts." (Mem. Supp. Mot. 13.) Since the VALIC Companies filed the present Motion, "additional clients have transferred account balances to CG Advisory [Services]," (Reply 3), with one having moved $255,000 in assets mere days before the April 16, 2021 hearing.

The actual and imminent harm facing the VALIC Companies is irreparable, notwithstanding the Former Advisors' contentions to the contrary. The VALIC Companies

submit evidence of lost customers, lost goodwill, lost customer trust, and damage to reputation. "Although it may be easy to calculate the amount of harm caused with respect to a single transaction between [the Former Advisors] and a client, the Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of irreparable harm.'" *Samilow*, 311 F. Supp. 3d at 796 (quoting *Multi–Channel TV Cable Co.*, 22 F.3d at 552); *see also Bradley*, 756 F.2d at 1055.[27]  Given this clear precedent and the evidence before the Court, the VALIC Companies have established that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

### D.  Balance of Equities

The Court next considers the third *Winter* factor:  whether the balance of the equities tips in favor of granting preliminary relief.  The VALIC Companies argue that the balance tips in their favor, as "the continued threat of injury to [them] exceeds any damage that any of the [Former Advisors] is likely to suffer from the entry of a TRO." (Mem. Supp. Mot. 28.)  The Former Advisors counter that they will suffer "substantial" harm if the Court grants injunctive relief because they will be left "with no client base in a business that thrives on commissions from regular clients."  (Resp. 20 (quoting *Plunkett*, 8 F. Supp. 2d at 519).)  According to the Former Advisors, this potentially "devasting" consequence of granting an injunction outweighs

---

[27] The Former Advisors note that the VALIC Companies have more than $100 billion in total assets.  (Resp.)  To the extent they submit this fact to suggest that "any loss as a result of [the Former Advisors'] activities is dwarfed by [the VALIC Companies'] overall size," the Court observes that "that harm may still be irreparable." *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *3 (finding irreparable harm despite the former employer managing "over $1.5 trillion in assets").

"the minimal harm to be suffered by the VALIC Companies" if the Court declines to grant preliminary relief. (*Id.*)

When weighing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). "[A] balancing of the equities strongly favors granting an injunction to foreclose [a party] from benefitting from [its] misappropriation of [another's] trade secrets." *API Tech. Servs.*, 2013 WL 12131381, at *3 (quoting *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012)).

Here, the balance of the equities tips in favor of granting the requested relief. Although an injunction may somewhat impair the Former Advisors' ability to earn a living, that consequence was reasonably foreseeable, for the Former Advisors each "consent[ed] to entry of a temporary, preliminary, and permanent injunctive relief" for violating the FPAs' Misappropriation and the Nonsolicitation of Customers Provisions. (FPAs § V.F.3.) First, the Former Advisors will likely keep the customers they now have because the VALIC Companies have represented they will not claw back clients who already have transferred their accounts. Second, the requested relief will only minimally impair the Former Advisors' ability to earn a living because it will allow them to compete directly against the VALIC Companies—just not by soliciting their former clients. Finally, given that the Parties will begin arbitration in fifteen days, any harm befalling on the Former Advisors from an injunction will be temporary. On the other hand, "[the VALIC Companies] have an interest in protecting its customers pending resolution of the case." *Samilow*, 311 F. Supp. 3d at 796 (citation omitted). And equity "strongly favors" enjoining the Former Advisors from continuing to benefit from their

misappropriation of the VALIC Companies' trade secrets. *See API Tech. Servs.*, 2013 WL 1213181, at *3; *Kolon Indus.*, 894 F. Supp. 2d at 709. "[C]onsidering the legitimate interests at stake, the balance of the equities . . . warrant[s] an injunction here." *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *4.

> E.     **Public Interest**

The final *Winter* factor, whether the public interest weighs in favor of granting preliminary relief. According to the VALIC Companies, "[a] cognizable public interest exists in upholding an agreement in which an employer seeks to protect itself from post-termination piracy of its most valuable information, as well as discouraging employees from breaching their trust and misappropriating trade secret and confidential information for their own gain." (Mem. Supp. Mot. 29–30 (citation omitted).) The Former Advisors rejoin that granting the requested relief here would run counter to the public interest. "First, in Virginia, enforcement of a restraint on trade, such as the [Nonsolicitation of Customers Provision], is disfavored." (Resp. 26 (citation omitted).) Second, "the public's interest is not served by enjoining [the Former Advisors] and restricting their clients' ability to choose who will service their accounts." (*Id.* 28.)

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted). Courts within the Fourth Circuit recognize that "[p]ublic interest favors the protection of confidential business information and the enforcement of valid contracts." *Fidelity Glob. Brokerage Grp.*, 2010 WL 4646039, at *4 (citing *ABT, Inc. v. Juszyczyk*, No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010)); *accord Samilow*, 311 F. Supp. 3d at 796.

And "[t]here is no doubt that it is in the public interest to protect trade secrets." *API Tech. Servs.*, 2013 WL 12131381, at *3 (international quotation marks and citation omitted).

The public interest favors an injunction here.  Although the Former Advisors are correct that "contracts in restraint of trade are generally disfavored under Virginia law as a matter of public policy," they err in this instance because Virginia law also "encourage[s] the enforcement of *valid* non-[solicitation] agreements, such as the one at issue here." *Samilow*, 311 F. Supp. 3d at 796.  Thus, contrary to the Former Advisors' contention, Virginia public policy favors enforcement of the valid restrictive covenant at issue in this case.  The Former Advisors also urge that an injunction would interfere with the broker-client relationship, which implicates especially weighty public-interest concerns.  But the requested relief does not prevent clients from transferring accounts on their own accord and based on an informed choice.  Rather, it prevents the Former Advisors from violating valid confidentiality agreements with their employers and misappropriating trade secrets for personal gain.  "There is no doubt that it is in the public interest to protect trade secrets and to protect competitors from behavior of the sort engaged in by" the Former Advisors.  *API Tech Servs.*, 2013 WL 1213181, at *3 (quoting *Kolon*, 894 F. Supp. 2d at 709).

**F.**     **Scope of the Injunction**

Having found the VALIC Companies entitled to a preliminary injunction, the Court must "consider the proper scope of the imposed restraint." *API Tech Servs.*, 2013 WL 1213181, at *4 (citing *Kolon*, 894 F. Supp. 2d at 710).  The VALIC Companies request an order with nine terms, which the Court summarizes as follows:

> 1.  Enjoining the Former Advisors and any officer, agent, employee, or representative of CG Advisory Services from soliciting or inducing, or attempting to solicit or induce, any Protected Customer to end or alter his, her, or its relationship with the VALIC Companies;

47

2. Enjoining the Former Advisors and any officer, agent, employee, or representative of CG Advisory Services from soliciting or inducing, or attempting to solicit or induce, any of the VALIC Companies' employees to end or alter his or her relationship with the VALIC Companies or to contract or associate with a competitor or potential competitor;

3. Requiring each Former Advisor to furnish the VALIC Companies a list of all the VALIC Companies' clients that they or anyone acting for their benefit has contacted since January 1, 2021, including the date, time, manner, and substance of the contact;

4. Enjoining each Former Advisor from using, retaining, disclosing, or transmitting for any purpose any and all property, trade secrets, and other confidential and proprietary information of the VALIC Companies;

5. Enjoining each Former Advisor, whether alone or in concert with others, from processing any change of broker-dealer forms signed by Protected Customers until such time as the customer's knowing choice can be confirmed;

6. Ordering each Former Advisor and anyone acting in concert or participation with them to return to the VALIC Companies' counsel any and all property of the VALIC Companies, including the VALIC Companies' client information, whether in original, copied, computerized, handwritten, or any other form;

7. Ordering each Former Advisor to: (a) certify that he and any person acting at his direction no longer possess any of the VALIC Companies' Client Information, either in electronic, hard copy, or any other format; (b) identify all electronic storage media on which any of the VALIC Companies' client information or other information of the VALIC Companies has ever been stored; and, (c) certify that he and any person acting on his behalf have complied with each of the foregoing and have not disclosed any of the VALIC Companies' Client Information to any third party;

8. Ordering each Former Advisor to preserve and make available for immediate forensic inspection by the VALIC Companies or its experts all electronic devices used by the Former Defendants; and,

9. Ordering each Former Advisor to refrain from destroying, erasing, or otherwise making unavailable for further proceedings in this matter any records or documents in their possession or control which were obtained from, or contained information derived from, any of the VALIC Companies' records, which pertain to the VALIC Companies' clients, or which relate to any of the events alleged in the Complaint in this action.

(*See* Mot. 2–5.)

"[I]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). "Still, a court should mold its decree to meet the exigencies of the particular case." *Id.* (internal quotation marks and citations omitted). "And a court must ensure a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (internal quotation marks and citations omitted).

The first two terms the VALIC Companies request lack temporal limits but are otherwise reasonable. As requested, these terms would remain effective forever, which not only would unreasonably restrain trade but also would effectively continue the Nonsolicitation of Customers and Nonsolicitation of Employees Provisions past their one-year-after-termination expiration dates. (*See* FPAs § V.F.1.a and c.) Accordingly, the Court will narrow the scope of these terms so that they expire upon the arbitrator's modification of injunctive relief or determination of the merits of the dispute.

The Court views the third requested term, requiring the Former Advisors to affirmatively furnish information to the VALIC Companies, as unreasonable. The requested term therefore constitutes a "mandatory preliminary injunction—those that alter rather than preserve the status quo"—instead of a prohibitory preliminary injunction. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 n.8 (4th Cir.), *cert. denied sub nom. Givens v. Mountain Valley Pipeline, LLC*, 140 S. Ct. 300, 205 L. Ed. 2d 199 (2019). "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances," which are not present here. *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). Accordingly, the Court rejects this requested term.

The Court finds the fourth requested term, enjoining each Former Advisor from using, disclosing, altering, or transmitting the VALIC Companies' property, trade secrets, and other confidential and proprietary information, reasonable. It essentially would force the Former Advisors to comply with the Misappropriation Provision of the FPAs and preserve the status quo for the Parties. (*See* FPA § V.C.3.) The Court therefore accepts this term as requested. *See Roe*, 947 F.3d at 231.

The fifth requested term would enjoin each Former Advisor from processing any change of broker-dealer forms signed by Protected Customers until such time as the customer's knowing choice can be confirmed. The Court finds the phrase "until such time as the customer's knowing choice can be confirmed" to be vague and therefore unreasonable. In its place, the Court substitutes the phrase "unless the Protected Customer's choice is confirmed by both Parties." The revised term provides meaningful relief by preventing the Former Advisors from continuing to benefit from any client contact made before the entry of this injunction. Even so, the revised term respects the broker-client relationship by allowing clients to decide who their advisor will be. It is also narrowly tailored because it prevents the Former Advisors only from further benefitting from their misappropriations of the VALIC Companies' trade secrets. Thus, the revised provision "is no more burdensome to [the Former Advisors] than necessary." *Id.*

The sixth requested term is warranted. Although it mandates that the Former Advisors return all VALIC Companies property to the VALIC Companies, that mandate merely orders the Former Advisors to comply with the FPAs and preserve the status quo. The Court accepts this requested term as meeting "the exigencies of [this] case." *Id.*

The seventh requested term contains three subparts, all of which are reasonable. Two subparts, (a) and (c), require the Former Advisors to certify that they have complied with the

50

preliminary injunction and that they no longer possess client information.  Both certifications provide meaningful relief to the VALIC Companies' without imposing much, if any, additional burden on the Financial Advisors.  The remaining subpart, (b), orders each Former Advisor to identify any electronic media on which they have ever stored client information.  Despite its breadth, this order is reasonable, as it informs the VALIC Companies of what devices it may need to forensically analyze.  Because all three subparts of this requested term are reasonable, the Court accepts this term.  *See id.*

The eighth requested term is overbroad.  As written, this requested term would subject to forensic inspection any device used by each Former Advisor, even strictly personal devices. That term is broader than necessary to provide the VALIC Companies relief and would impose a substantial burden on the Former Advisors by invading their privacy.  *See id.*  The term is also unnecessary.  The Court is ordering the Former Advisors to identify any electronic media on which they have ever stored client information, so the VALIC Companies have no need to inspect every device the Former Advisors own.  Because the eighth term is overbroad and unnecessary, and the Court finds it unreasonable and rejects it.

Finally, the ninth requested term is reasonable.  It orders each Former Advisor to preserve evidence during the proceedings in this matter, which imposes no additional burdens beyond Federal Rule of Civil Procedure 37(e) but affords meaningful protection for the VALIC Companies' interests as well as the interests of justice.  *See id.*; *see also* Fed. R. Civ. P. 37(e). Accordingly, the Court accepts this provision.

## IV.  Conclusion

The VALIC Companies established that a preliminary injunction is warranted. Therefore, the Court will grant in part the VALIC Companies' Motion and Application for

51

Temporary Restraining Order, (ECF No. 5).  An Order entered on April 16, 2021, preceded this memorandum opinion, (ECF No. 20).

$$\text{/s/}$$

M. Hannah Lauck
United States District Judge

Date: 4/21/21
Richmond, Virginia